119 P.3d 309 (2005)
2005 UT App 324
STATE of Utah, in the interest of S.H., a person under eighteen years of age.
J.W., Appellant,
v.
State of Utah, Appellee.
No. 20040860-CA.
Court of Appeals of Utah.
July 21, 2005.
*310 Justin Gary Jensen, Draper, for Appellant.
Mark L. Shurtleff, Attorney General and John M. Peterson, Assistant Attorney General, Salt Lake City, for Appellee.
Martha Pierce and Suchada P. Bazzelle, Salt Lake City, Guardians Ad Litem.
Before Judges GREENWOOD, JACKSON, and ORME.

OPINION (For Official Publication)
ORME, Judge:
¶ 1 J.W. (Father) appeals from a decision of the juvenile court terminating his parental rights. Father specifically argues that (1) the juvenile court required him to establish *311 paternity under the wrong standard of review, (2) the juvenile court denied his right to counsel and his right to receive notification of the proceedings in violation of the Due Process clause of the Fourteenth Amendment, and (3) the findings of fact were insufficient to justify the termination of his parental rights. We affirm.

BACKGROUND
¶ 2 In January of 2004, M.H. (Mother) gave birth to a baby boy (Child). At the time of Child's birth, his biological father's identity was unknown. Mother had been sexually involved with both Father and K.S. (Boyfriend) around the time of conception and, as a result, she was unsure which of the two was actually Child's biological father.
¶ 3 Over a year earlier, in October of 2002, Father was charged with two drug-related felonies and a misdemeanor. In February of 2003, Father started attending the district court's "drug court." He went to drug court review hearings over the course of the next several months to report on his progress. During that time, the court reported that Father was frequently noncompliant with the drug court's orders, that he missed required drug tests, and that he tested positive for drugs. Based upon his lapses, the district court imposed ten hours of community service for Father to complete, five of which needed to be completed before his next court date. In October 2003, Father failed to appear before the drug court because, as he later testified, he "didn't get [his] community service done." The court issued a $25,000 cash-only bench warrant for his failure to appear.
¶ 4 Child was born in January of 2004, testing positive for methamphetamine. Mother admitted to having used methamphetamine during the pregnancy and gave temporary custody of Child to his maternal aunt. On February 4, 2004, the State sought to obtain custody of Child by filing a petition to transfer custody and guardianship of Child. On February 10, the juvenile court held a pretrial hearing on the State's petition to transfer custody and guardianship of Child. At this time, paternity still had not been established. Boyfriend was in attendance at the hearing[1] and was ordered to report to the Division of Child and Family Services (DCFS) for a genetic test so that paternity could be determined. Father's DNA was already on file by reason of a prior paternity action. Mother and Child finally appeared to furnish DNA samples on April 29, 2004.
¶ 5 On April 12, 2004, the juvenile court held a permanency hearing on the custody matter. There, the juvenile court indicated that no person had "preserved his rights as a father of standing or to notice or consent relating to an adoption or other Order of the Court regarding [Child]." It acknowledged that Father had stated his intentions to file a voluntary declaration of paternity. The juvenile court stated that Father, or any other potential father of the child, would "be required to establish paternity by clear and convincing evidence prior to any recognition of paternal rights or status as a party with standing in this action."
¶ 6 Father turned himself in on his outstanding bench warrant on April 13, and filed a voluntary declaration of paternity that same day. However, he did not provide any proof to the court or to Mother that he had filed the declaration. Thus, the court had no knowledge of Father's paternity.
¶ 7 Father was incarcerated from April 13 to June 12, 2004. On May 20, the State filed a petition for termination of Mother's parental rights. A few days later, Father submitted a request for court-appointed counsel. The court denied his request on the ground that paternity still had not been established.
¶ 8 On July 8, 2004, after receiving the results of the genetic testing, the juvenile court acknowledged that Father was, in fact, Child's biological parent and therefore appointed counsel for Father. At a hearing on August 4, the court entered formal findings that Father was the biological father. That same day, the State amended its petition for termination of Mother's parental rights to include Father's rights as well. The matter *312 came on for trial on September 3, 2004, and at the conclusion of the trial the court entered an order terminating Father's parental rights to Child pursuant to Utah Code section 78-3a-407. See Utah Code Ann. § 78-3a-407 (2002). In its findings of fact, the court stated that Father had a criminal history that negatively affected his ability to parent, specifically noting that Father was previously "on the run" from drug court; had a bench warrant issued against him; and did not fully comply with the drug court's and district court's orders. The juvenile court also indicated that Father's criminal involvement delayed the process of establishing paternity.
¶ 9 Father now appeals the juvenile court's decision to terminate his parental rights.

ISSUES AND STANDARDS OF REVIEW
¶ 10 Father makes several claims on appeal. First, he argues that, at the April 12 hearing, the juvenile court erred by requiring him to establish paternity by clear and convincing evidence rather than by a preponderance of the evidence. Whether the juvenile court applied the wrong standard of proof involves statutory interpretation and is thus a question of law reviewed for correctness. See Hansen v. Hansen, 958 P.2d 931, 933 (Utah Ct.App.1998).
¶ 11 Father next argues that the juvenile court violated his Due Process rights under the Fourteenth Amendment when it denied his request for court-appointed counsel and when he did not receive notification of hearings concerning Child. "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." Chen v. Stewart, 2004 UT 82,¶ 25, 100 P.3d 1177.
¶ 12 Finally, Father argues that the findings of fact were insufficient to justify the termination of his parental rights. "Application of statutory law to the facts presents a mixed question of fact and law. We review the juvenile court's findings for clear error and its conclusions of law for correctness, affording the court `some discretion in applying the law to the facts.'" In re G.B., 2002 UT App 270,¶ 11, 53 P.3d 963 (citation omitted).

ANALYSIS
¶ 13 Father first contends that the juvenile court erred by requiring him to prove his paternity by clear and convincing evidence rather than by a preponderance of the evidence. He contends that as a result of the juvenile court's error he was denied the right to counsel and was not notified about the proceedings, in violation of the Due Process clause of the Fourteenth Amendment.
¶ 14 At the April 12 permanency hearing, the juvenile court clearly erred in stating that "any ... potential father shall be required to establish paternity by clear and convincing evidence prior to any recognition of paternal rights or status as a party with standing in this action." Although we agree that the correct standard to use in determining paternity is a preponderance of the evidence, see Utah Code Ann. § 78-45a-6.5 (2002), we cannot say that Father was harmed by the court's error. Utah Code section 78-45a-7(2) gives the court full authority to order genetic testing, sua sponte, as it did in this case.[2]See id. § 78-45a-7(2). Genetic testing is capable of determining paternity with a high percentage of accuracy and will generally satisfy any evidentiary standard employed by the court. Thus, even though the court purported to require Father to meet a higher standard of proof, the results of the genetic testing would have satisfied either standard and, therefore, Father was not harmed by the court's error.
¶ 15 Father next contends that his Due Process rights were violated because the juvenile court required him either to file a voluntary declaration of paternity or to establish paternity through genetic testing before it would recognize him as a party with standing and parental rights in this action. For the purposes of establishing paternity, a *313 voluntary declaration of paternity, duly signed and filed, has the same effect as a judicial determination of paternity. See id. §§ 78-45e-2, -4(1). Father argues that, regardless of whether he properly filed a voluntary declaration, he should have received notification regarding all of the relevant proceedings, he should have been appointed counsel before July of 2004, and he should have been held to have standing at the April 12 hearing. We disagree.[3]
¶ 16 Both the United States Supreme Court and the Utah Supreme Court have held that a putative father is not necessarily entitled to "constitutionally protected parental rights." In re adoption of B.B.D., 1999 UT 70,¶ 10, 984 P.2d 967. Accord Lehr v. Robertson, 463 U.S. 248, 257-60, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Thus,
[w]hile it is true that the relationship between parent and child is afforded some protection by the federal and state constitutions, the rights of parents are commensurate with the responsibilities they have assumed, and in the case of unmarried fathers, a biological relationship alone is insufficient to establish constitutionally protected parental rights.
B.B.D., 1999 UT 70 at ¶ 10, 984 P.2d 967 (citation omitted). In Lehr, the United States Supreme Court addressed whether an unwed father, who did not register his name in the New York "putative father registry" and who had not cultivated a meaningful relationship with his child, had an absolute constitutional right to notice of adoption proceedings involving the child. 463 U.S. at 249-50, 103 S.Ct. 2985. In holding that the putative father was not entitled to receive notice, the Court stated that "the mere existence of a biological link does not merit equivalent constitutional protection," id. at 261, 103 S.Ct. 2985, because there is a "clear distinction between a mere biological relationship and an actual relationship of parental responsibility." Id. at 259-60, 103 S.Ct. 2985. The Court further observed that
"[e]ven if it be assumed that each married parent after divorce has some substantive due process right to maintain his or her parental relationship, it by no means follows that each unwed parent has any such right. Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring."
Id. at 260, 103 S.Ct. 2985 (citations omitted) (emphasis in original).
¶ 17 The father's failure to follow New York's statutory scheme to register in the putative father registry, coupled with his failure to cultivate a relationship in any way with the child, demonstrated that he had chosen not to commit fully to the responsibilities of parenthood. See id. at 263-64, 103 S.Ct. 2985. In fact, the Court noted that the father's lack of commitment was highlighted by the ease with which he could have registered. See id. at 264, 103 S.Ct. 2985. "[T]he right to receive notice was completely within appellant's control. By mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceedings to adopt [his child]." Id. As a result, the Court held that the father did not merit constitutional protections. Id. at 263-65, 103 S.Ct. 2985.
¶ 18 In a similar vein, the Utah Supreme Court has held that a putative father who failed to comply with the provisions of the Utah Adoption Act and the Voluntary Declaration of Paternity Act had waived his constitutionally protected interest in a child. See B.B.D., 1999 UT 70 at ¶ 34, 984 P.2d 967. In B.B.D., the Utah Supreme Court affirmed this court's holding that the father could not assert an interest in the child because he did not file a notice of paternity or a paternity action in Utah. See id. at ¶¶ 11-12. The Court noted specifically that "he failed to make any attempt to establish legal paternity under the provisions of Utah law" and, therefore, "he ... lost any parental right or interest to B.B.D." Id. at ¶ 2. In language parroting that *314 of the United States Supreme Court, the Utah Supreme Court noted that "an unmarried biological father has an inchoate interest that acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood ... [which commitment is demonstrated] by establishing legal paternity, in accordance with the requirements of [Utah law]." Id. at ¶ 11 (citation and internal quotations omitted) (emphasis omitted; second alteration in original). Moreover, "[i]f an unmarried father fails to adhere to these requirements, including taking the necessary steps to establish paternity, his biological parental interest may be lost entirely, or greatly diminished in constitutional significance by his failure ... to strictly comply with the available legal steps to substantiate it." Id. (citation and internal quotations omitted) (emphasis omitted). Cf. Swayne v. L.D.S. Soc. Servs., 795 P.2d 637, 643 (Utah 1990) (holding that due process is not violated by requiring unmarried father to file acknowledgment of paternity before he is entitled to rights of notice and consent).
¶ 19 Here, Father did not take the steps necessary to establish paternity. Filing a simple declaration of paternity was an option available to Father at least as of the day Child was born. (Both Father and Boyfriend visited Mother and the newborn Child in the hospital in January of 2004). Yet he did not attempt to file the declaration until April. It would be unreasonable to require the court to provide notification and court-appointed counsel to Father when the court did not know who Child's father was.[4] If Father had wanted to secure constitutional protections as a parent prior to the judicial determination of his fatherhood, filing a paternity declaration was the only viable option available to him.[5]
¶ 20 Father argues that paternity would have been established much earlier but for Mother's delay in submitting her DNA sample. However, means other than genetic testing were available to Father to establish his paternity. It was "completely within [his] control" to file a voluntary declaration of paternity and thus "guarantee[ ] that he would receive [constitutional protection]." Lehr, 463 U.S. at 264, 103 S.Ct. 2985. His decision not to comply with the legal steps to substantiate his paternity "greatly diminished" Father's "biological parental interest" in Child because constitutional protections attached only when "he demonstrate[d] a timely and full commitment to the responsibilities of parenthood ... by establishing legal paternity, in accordance with the requirements of [Utah law]."[6]B.B.D., 1999 UT 70 at ¶ 11, 984 P.2d 967 (second alteration in original) (citation and internal quotations omitted).
¶ 21 Father argues that because the juvenile court was on notice that he was a potential father, it should have sent him notification about any hearings relating to Child. In Lehr, the United States Supreme Court rejected the father's contention that he should have received special notice because the mother and the lower court knew that he was involved in paternity proceedings in an affiliated court and thus were on notice of his *315 interest in the adoption proceedings. See Lehr, 463 U.S. at 264-65, 103 S.Ct. 2985. In so ruling, the Court stated that "[t]he Constitution does not require either a trial judge or a litigant to give special notice to nonparties who are presumptively capable of asserting and protecting their own rights." Id. at 265, 103 S.Ct. 2985. Again, in the case before us, Father was capable of filing a voluntary declaration of paternity and preserving his rights as a parent to Child. Thus, the trial court was not required to provide him with special notice.
¶ 22 Father next argues that the juvenile court erred in concluding that Father's criminal history and failure to comply with the drug court's orders negatively affected his ability to parent and that Father was at fault for the delay in establishing paternity or parental involvement. However, the findings of fact indicate that, as part of a plea agreement, Father had agreed to attend drug court. Because Father missed several of the court's group sessions and tested positive for drugs, the court ordered him to perform community service. He did not complete the community service and failed to appear at a district court review hearing in order to avoid being put in jail. He waited several months to turn himself in, which ultimately resulted in three months of incarceration after his son was born  time that could have been spent with his son if he simply had complied with the court's order to perform community service. Moreover, he could have used the time he spent as a fugitive to establish his paternity, by declaration or otherwise, giving him a protected interest much earlier in the proceeding.
¶ 23 Father also argues that the juvenile court's conclusions of law, including that Father was an "unfit or incompetent parent[ ]," and that Father "ha[d] been unable to or unwilling to remedy the circumstances that caused the child to be in an out-of-home placement, and there is a substantial likelihood that [he] will not be capable of exercising proper and effective parental care in the near future" were not supported by the findings of fact. On the contrary, the juvenile court's findings that Father had an extensive criminal history, that he failed to appear in drug court, that he disobeyed court orders, that he was incarcerated after the child was born, and that he delayed filing a voluntary declaration of paternity, all support its conclusions regarding Father's fitness as a parent.

CONCLUSION
¶ 24 Father has failed to show that the juvenile court's error in reciting the wrong evidentiary standard has harmed him in this case. We agree with the juvenile court that Father was not entitled to receive notification or court-appointed counsel until his paternity had been established, either judicially or by his filing a declaration of paternity. We see no error in the juvenile court's decision to terminate Father's parental rights.
¶ 25 WE CONCUR: PAMELA T. GREENWOOD and NORMAN H. JACKSON, Judges.
NOTES
[1] Father later testified that he was not in attendance at the February 10 hearing and other hearings because he did not receive notification that hearings were being held.
[2] Given that the two putative fathers both admitted to having sexual intercourse with the mother during the relevant time period, the court's only viable course of action was to order genetic testing to determine paternity.
[3] We note at the outset that paternity had still not been established at the April 12 hearing. Father's argument is thus essentially an invitation for this court to extend standing and parental due process protections to any person claiming status as a putative father, even if that person has not taken any measures to substantiate his paternity claim. As will be seen, case law does not support Father's position.
[4] As soon as the court established that Father was Child's biological father, his right to counsel attached under Utah Code section 78-3a-913. See Utah Code Ann. § 78-3a-913(1)(a) (2002) (providing that in juvenile proceedings "parents, guardian, custodian, and the minor" are entitled to court-appointed counsel). However, at the time Father requested court-appointed counsel, he had not established himself as a parent to Child, and thus the court was under no obligation to provide him with counsel. As soon as paternity was established, the court then provided Father with counsel in accordance with section 78-31-913.
[5] Father suggests it is untenable to expect he would file a declaration of paternity when his fatherhood was in such doubt. While at first blush this position seems valid, a provision of Utah law undercuts it significantly: If a putative father files a voluntary declaration of paternity and then subsequently discovers that he is not the biological father of the child, the putative father may rescind his voluntary declaration of paternity in accordance with the provisions of Utah Code section 78-45e-4. See Utah Code Ann. § 78-45e-4 (2002).
[6] At the April 12 hearing, the court recited Father's claim that he was going to file a voluntary declaration of paternity. Indeed, Father filed his declaration of paternity the next day, but he failed to provide notice to the court and to Mother that the declaration had been filed. Thus, the court had no actual knowledge of his paternity until the results of the genetic testing were provided to the court.