**2016 UT App 145**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF E.M.J.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

A.M.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Memorandum Decision
No. 20150614-CA
Filed July 14, 2016

Third District Juvenile Court, Salt Lake Department
The Honorable Mark W. May
No. 1091549

Liza M. Jones, Attorney for Appellant

Sean D. Reyes, John M. Peterson, and Carol L.C.
Verdoia, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

SENIOR JUDGE PAMELA T. GREENWOOD authored this
Memorandum Decision, in which JUDGES J. FREDERIC VOROS JR.
and MICHELE M. CHRISTIANSEN concurred.[1]

GREENWOOD, Senior Judge:

¶1     A.M. (Father) appeals the juvenile court's termination of
his parental rights in E.M.J. We affirm.

---

1. Senior Judge Pamela T. Greenwood sat by special assignment
as authorized by law. *See generally* Utah R. Jud. Admin. 11-
201(6).

¶2    E.M.J. was removed from Father's custody in October 2013 after Father "had a medical incident involving psychiatric medicine that involved physical restraint by the police." Following a hearing, the juvenile court adjudicated E.M.J. neglected by his mother[2] and dependent as to Father. The juvenile court set a permanency goal for E.M.J. of reunification with Father and ordered Father to complete mental health therapy and follow all recommendations of his therapist. In connection with his treatment, Father was required to undergo periodic drug testing. After making positive progress for several months, Father began skipping drug tests and missing visits with E.M.J. He then failed to appear at a review hearing in August 2014, at which point the juvenile court ordered that Father's visitation be therapeutically supervised at the discretion of the therapist. The juvenile court expressed confusion at Father's behavior, observing that Father "was very close to having [E.M.J.] returned but had begun to 'shoot himself in the foot' by failing to take drug tests and missing visits."

¶3    In October 2014, the juvenile court held a permanency hearing. Father again failed to appear. At the permanency hearing, it was reported that Father had completed his individual treatment but had not taken any drug tests since July 2014 and had only two visits with E.M.J. since the August review hearing, neither of which had gone well. The therapist expressed his opinion that visits between Father and E.M.J. should be terminated. Based on this information, the juvenile court terminated reunification services and changed E.M.J.'s permanency goal to adoption. However, the court reaffirmed its prior order regarding visitation, which permitted Father to have therapeutically supervised visitation with E.M.J. at the therapist's discretion. A few days later, the State filed a petition

---

2. E.M.J.'s mother voluntarily relinquished her parental rights in December 2014 and has no involvement in this appeal.

to terminate Father's parental rights, in which it raised several grounds in support of termination.

¶4    Following the permanency hearing, E.M.J.'s therapist and E.M.J.'s foster mother informed Father that his visitation rights had been discontinued.[3] Relying on this information, Father moved to California in November to live with his parents and made no attempt to contact E.M.J. for several months, although Father's parents had consistent phone contact with E.M.J. and sent letters and gifts. When Father finally learned that there was no court order terminating visitation, he made a single phone call to E.M.J.'s caseworker in April 2015 to arrange visitation but then failed to follow up.[4]

¶5    In January 2015, the State amended its petition to include the ground of abandonment and ultimately restricted its arguments at the termination trial to that ground. The termination trial was held in June 2015. At the trial, the State asserted that Father had abandoned E.M.J. by failing to communicate with him for more than six months. *See* Utah Code

---

3. Father also testified that his attorney informed him that visitation had been terminated, but as the attorney did not testify at the termination trial, the juvenile court did not find Father's testimony to be credible.

4. There was a factual dispute as to whether the caseworker was supposed to call Father back after contacting the therapist or whether Father was supposed to call the caseworker. The juvenile court found the caseworker's testimony more credible than Father's on this point but observed that it was ultimately irrelevant who was supposed to make the follow-up call because a "'dedicated' parent would have continued to call the worker until the issue was resolved."

Ann. § 78A-6-508(1)(b) (LexisNexis Supp. 2015).[5] Father responded that he stopped contacting E.M.J. only because he was misinformed as to his visitation rights. The juvenile court determined that the State had made a prima facie showing of abandonment and that Father's evidence had failed to overcome that showing. The court further determined that termination was in E.M.J.'s best interests. Accordingly, the juvenile court terminated Father's parental rights. Father now appeals.

¶6     Father first asserts that the juvenile court employed the wrong procedural framework and standard of proof in evaluating whether he abandoned E.M.J. Whether the juvenile court applied the correct standard of proof is a question of law, which we review for correctness. *See In re S.H.*, 2005 UT App 324, ¶ 10, 119 P.3d 309.

¶7     "[A] showing of abandonment requires satisfaction of a two-part test." *In re T.E.*, 2011 UT 51, ¶ 20, 266 P.3d 739. The petitioner must demonstrate, first, "that the respondent parent has engaged in conduct that implies a conscious disregard for his or her parental obligations" and, second, "that the respondent parent's conduct led to the destruction of the parent–child relationship." *Id.* A parent's failure "'to communicate with the child by mail, telephone, or otherwise for six months'" constitutes prima facie evidence of abandonment, creating "a presumption that the respondent parent has abandoned the child." *Id.* ¶ 21 (quoting Utah Code Ann. § 78A-6-508(1)(b)). The burden then shifts to the respondent parent to rebut the presumption by presenting "evidence indicating that [the parent] did not consciously disregard [his or her] parental obligations or that [his or her] conduct did not lead to the destruction of the parent–child relationship." *Id.* ¶ 22. In doing

---

5. We cite the most current version of the Utah Code for the reader's convenience.

so, "respondent parents are not required to demonstrate by clear and convincing evidence that they did not abandon the child" but "need produce only enough evidence to persuade the juvenile court that the petitioner seeking to terminate [the respondent parent's] parental rights has not established abandonment by clear and convincing evidence." *Id.* ¶ 23. The court is required to "consider the totality of the evidence" to determine whether there is "clear and convincing evidence to support a finding of abandonment." *Id.*

¶8 Father asserts that the juvenile court improperly required him to disprove abandonment by clear and convincing evidence because it "evaluated Father's evidence in a manner that required him to show that either he did in fact communicate with E.M.J. or that he had a legitimate reason for his lack of successful[] communication." Instead, Father asserts, the juvenile court should have considered only whether Father *consciously* disregarded his parental obligations toward E.M.J. Father argues that the court inappropriately rejected his explanation for failing to contact E.M.J.—that he believed his visitation rights had been terminated—based on its conclusion that a reasonable person would not have relied on the therapist's and foster mother's representations to that effect when there was no corresponding court order. At oral argument, Father explained that the court should have instead considered only whether he personally believed he could not have contact with E.M.J., because such a belief would belie any *conscious* disregard of his parental obligations.

¶9 We disagree with Father's assessment of the juvenile court's analysis. Although the court did find that it was unreasonable for Father to rely on the representations of the therapist and foster mother in establishing his belief that he was barred from visiting E.M.J., the court's decision relied primarily on its determination that Father's actions—even in light of that belief—were inconsistent with those of a "dedicated" parent.

Indeed, we have previously indicated that even when a parent is barred from contact with his children by means of a protective order, his lack of effort toward restoring his visitation rights, his failure to provide support for the children in the interim, and his failure to take advantage of opportunities to visit the children demonstrate a conscious disregard for parental obligations. *See In re I.B.*, 2007 UT App 177U, paras. 4–5 (per curiam); *In re B.H.*, 2003 UT App 160U, para. 2 n.1.

¶10    Here, the juvenile court explained that Father's single phone call to the caseworker once he learned that visitation had not terminated "belied" his "excuses for not keeping in contact with [E.M.J.]" because a "'dedicated' parent would have continued to call the worker until the issue was resolved." The juvenile court observed that Father's failure to pay child support and his failure to provide "gifts, telephone calls, cards or letters for Christmas, [E.M.J.'s] birthday, special occasions or other holidays" further demonstrated Father's apathy toward E.M.J. Although Father testified that "he was told not to provide such items," the court did not find this testimony to be credible. The court found that Father had previously been "on track to successfully complete his service plan and have [E.M.J.] returned to his custody" but that Father had "abandoned his progress" by ceasing to participate in drug testing; missing visits with E.M.J.; abandoning contact with the caseworker, his attorney, and the court; moving to California and "completely dropp[ing] out of [E.M.J.'s] life"; and, upon learning that he could have contact with E.M.J., making only "a half-hearted effort to contact his son, which he quickly abandoned." Thus, even assuming that Father legitimately believed that he was restricted from visiting E.M.J., the court made it clear that it considered Father's actions to have displayed a conscious disregard for his parental obligations. Weighing Father's evidence in its totality, the court concluded that the evidence was insufficient "to overcome the prima facie showing of abandonment." Nothing in the juvenile court's order convinces us that it placed an undue burden on Father or

misapplied the framework outlined by our supreme court. *See In re T.E.*, 2011 UT 51, ¶¶ 20–23.

¶11    Father asserts that even if the court employed the correct framework, the evidence was insufficient to support the court's determination that he abandoned E.M.J. and that termination of his parental rights was in E.M.J.'s best interests. "[W]e give the juvenile court a wide latitude of discretion as to the judgments arrived at based upon not only the court's opportunity to judge credibility firsthand, but also based on the juvenile court judges' special training, experience[,] and interest in this field." *In re A.B.*, 2007 UT App 286, ¶ 10, 168 P.3d 820 (second alteration in original) (citation and internal quotation marks omitted). "Thus, in order to overturn the juvenile court's decision [t]he result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (alteration in original) (citation and internal quotation marks omitted).

¶12    Father first argues that the State failed to make a prima facie showing of abandonment—i.e., that Father had failed to communicate with E.M.J. "by mail, telephone, or otherwise for six months," *see* Utah Code Ann. § 78A-6-508(1)(b) (LexisNexis Supp. 2015)—because Father's parents' contact with E.M.J. was undertaken on Father's behalf. Father's argument depends on his assertion that his parents acted as his agents in making phone calls, sending letters, and giving gifts to E.M.J. In *In re T.E.*, 2011 UT 51, 266 P.3d 739, the supreme court held that a grandmother delivering a birthday card from a child's father constituted communication. *Id.* ¶ 28 n.36. But the *In re T.E.* court did not hold that vicarious communication is sufficient to demonstrate that a parent has communicated with his or her child; rather, it acknowledged that a birthday card *from* the father and hand-delivered by a third party constituted communication "'by mail.'" *Id.* (quoting Utah Code Ann. § 78A-

6-508(1)(b)). Here, Father does not claim that he had any direct communication with E.M.J.; rather, he asserts that his parents' phone calls to E.M.J. and his participation (unbeknownst to E.M.J.) in picking out a gift for E.M.J. constituted communication. But monitoring a child's life via a third party is not the same as communicating *with* the child, and since Father's contact with E.M.J. was indirect, it is distinguishable from the contact that occurred in *In re T.E.* Thus, we conclude that the State presented prima facie evidence that Father had failed to communicate with E.M.J. for six months.

¶13 Father next contends that the evidence was insufficient to support the juvenile court's determination that the totality of the evidence did not "overcome the [State's] prima facie showing of abandonment." We are sympathetic to Father's position that he misunderstood his visitation rights and that the discretion granted to the therapist to schedule visitation may have barred him from seeing E.M.J. even in the absence of a court order. However, in light of the evidence discussed above, *see supra* ¶ 10, we are not convinced that the juvenile court's determination that Father consciously disregarded his parental obligations to the destruction of the parent–child relationship was "against the clear weight of the evidence." *See In re B.R.*, 2007 UT 82, ¶ 12.

¶14 Finally, Father argues that the evidence was insufficient to support the juvenile court's determination that it was in E.M.J.'s best interests that Father's parental rights be terminated. The court found that E.M.J. has made "remarkable" developmental, educational, and behavioral progress since placement with the foster mother; that he "views the foster mother as his parent"; and that he is afraid of Father, is upset by the prospect of future visits with Father, and has expressed no desire to see Father. In light of these circumstances, the juvenile court determined that it was in E.M.J.'s best interests "to have [Father's] parental rights terminated so that [E.M.J.] can remain in his current placement, be adopted by his foster mother, and have the stability that he

needs." In contesting these findings, Father merely reargues the evidence and has failed to establish that there was insufficient evidence to support the findings. Indeed, Father's argument relies primarily on his assertion that the court's best interests finding was based "solely on testimony from" the foster mother and that the foster mother's "credibility is of concern." But credibility is a question for the juvenile court, *In re A.B.*, 2007 UT App 286, ¶ 10, and Father has failed to show that the juvenile court's reliance on the foster mother's testimony was an abuse of its discretion. Likewise, Father's assertion that the juvenile court should have attributed E.M.J.'s progress "to proper mental health diagnosis and medication," rather than to the foster mother's actions, goes to the juvenile court's weighing of the evidence and exercise of its discretion. Thus, Father has failed to establish that the evidence was insufficient to support the juvenile court's finding that termination of his parental rights was in E.M.J.'s best interests.

¶15   In examining the juvenile court's decision to terminate Father's parental rights, we are convinced that the court employed the correct procedural framework and burdens of proof in determining whether Father abandoned E.M.J. Further, the evidence was sufficient to support the juvenile court's determination that the State presented prima facie evidence of abandonment, that Father failed to overcome that prima facie showing, and that termination was in E.M.J.'s best interests. Accordingly, we affirm.

———————