**2017 UT App 106**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF X.C.H.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

G.H.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20150613-CA
Filed June 29, 2017

Third District Juvenile Court, Salt Lake Department
The Honorable Julie V. Lund
No. 1033582

Colleen K. Coebergh, Attorney for Appellant

Sean D. Reyes and John M. Peterson, Attorneys
for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES J. FREDERIC VOROS JR. and STEPHEN L. ROTH
concurred.

CHRISTIANSEN, Judge:

¶1     Appellant G.H. (Father) challenges the juvenile court's
order terminating his parental rights in X.C.H. (Child). We
affirm.

BACKGROUND

¶2    In November 2008, T.C. (Mother) gave birth to Child. In April 2010, the Division of Child and Family Services (DCFS) filed a verified petition alleging that Child was "abused, neglected, and/or dependent." The petition further alleged that "[G.H.] is the father of [Child]" and that G.H. was "believed to be residing in a detention facility in Montana." Father was not served with notice of the proceedings and did not appear. Nevertheless, the juvenile court "found the allegations of the State's petition to be true and correct" and incorporated the State's allegations regarding Father into its findings (the 2010 Order). After determining that Mother had been involved in multiple domestic violence incidents, the court ordered protective supervision services for Mother and Child. In October 2010, Mother and Child were released from protective services.

¶3    In 2014, the State filed another verified petition, seeking custody of Child. The petition stated that Father was Child's "alleged father."[1] In April 2014, after a shelter hearing, the juvenile court granted the State's request for custody of Child. The court observed that Father had not been served with notice of the shelter hearing, that "paternity for [Child did] not appear to be established by the alleged father," and that Father was believed to reside "out of state." Child went to live with a foster family with whom he had previously resided.

¶4    On May 22, 2014, the State's petition was adjudicated as to Mother. Mother did not attend the hearing, and the juvenile court entered a default judgment against her. The juvenile court found that Father was Child's "alleged father" and that his whereabouts were unknown, but that Mother believed he was

---

1. "'Alleged father' means a man who alleges himself to be, or is alleged to be, the genetic father or a possible genetic father of a child, but whose paternity has not been determined." Utah Code Ann. § 78B-15-102(2) (LexisNexis 2012).

living in Montana. The court ultimately concluded that Child was neglected and that DCFS would retain custody.

¶5    In a verified petition filed on July 22, the State sought termination of Mother's parental rights. This petition again stated that Father was Child's "alleged father."

¶6    Around that time, a DCFS caseworker began efforts to locate Father. She looked on "Vine Link and the Montana State website" to see if Father was incarcerated; looked "through the [Office of Recovery Services database] and [DCFS's] SAFE website" for a phone number for Father and found that "there was a phone number in there, but it wasn't correct"; and asked Mother's family for Father's contact information. She did not "look in any search engines," use whitepages.com, or hire a constable or private investigator to help locate Father. She also did not check to see if Father's paternity of Child had been established in Montana.

¶7    Mother eventually provided the DCFS caseworker with contact information for Father. On July 30, the DCFS caseworker called Father and left him a message "that [DCFS] didn't have [proof of] paternity for him"; however, she did not actually speak with Father until September 2. At that time, the DCFS caseworker "told [Father] again that [DCFS] didn't have [proof of Father's] paternity, and he said that he would get it to [her] by Monday," which was "less than a week" away. Father, however, did not timely follow through, and DCFS did not get "the paternity paper" from him until December 5.[2]

---

2. It is unclear what document this mention of Father's "paternity paper" referred to. During oral argument before this court, Father's counsel suggested that the document was a Montana birth certificate for Child. In her brief, the guardian ad litem asserted that "[t]he document, dated January 29, 2009[,] from an Ohio lab, appeared to be the results of genetic testing

(continued…)

¶8 Once DCFS received "the paternity paper" from Father, the DCFS caseworker maintained regular contact with him. The DCFS caseworker informed Father of a January 29, 2015 hearing related to Mother's termination trial, and the DCFS caseworker and Father met in person for the first time at that hearing.

¶9 Father's first supervised visit with Child took place on January 29 after the hearing, and Father had one more visit with Child on February 24. Father completed only one of his scheduled phone calls with Child even though the DCFS caseworker had rearranged the phone call schedule to accommodate Father's work schedule. Father provided no financial support, cards, or gifts for Child before the termination trial.

¶10 In February 2015, the juvenile court appointed Father's current counsel to represent him. And in April 2015, Father filed an answer in apparent response to the State's verified petition for termination of Mother's parental rights. In his answer, Father asserted that he "is [the] biological father of [Child], which has been established by DNA testing, and he believes this Court adjudicated him father."[3] Somewhat contradictorily, he also objected "to any findings from [the 2010 Order] pertaining to him," which included the finding that Father "is the father of

_____

(…continued)
confirming [Father's] biological relationship to Child." The document was not entered into evidence and does not appear in the record on appeal.

Regardless, in its order terminating Father's parental rights, the juvenile court found that the "documentation [from] December 2014, prov[ed] paternity had been established substantially at [Child's] birth."

3. "'Adjudicated father' means a man who has been adjudicated by a tribunal to be the father of a child." Utah Code Ann. § 78B-15-102(1).

[Child]"—the very finding Father now claims amounted to an adjudication of his paternity.

¶11    The juvenile court held a termination trial on May 4, 2015.[4] Both the DCFS caseworker and Child's foster father testified. At the conclusion of the trial, the juvenile court terminated Father's parental rights on grounds of abandonment and lack of anything other than token efforts at communication. The court also found it to be in Child's best interest to terminate Father's parental rights, observing that (1) Child had been cared for by his foster parents for more than a year; (2) he had formed an attachment to his foster family; (3) "[t]here [were] bonds of love and affection that exist[ed] in the [foster] home"; (4) Child had been thriving in the foster home; and (5) the foster parents were "meeting [Child's] needs and [were] willing to adopt him." The court expressed concern regarding DCFS's delay in contacting and locating Father, but it also observed that it was "not convinced that if [Father] had been located and joined in a more timely fashion, that there would have been a different result." Father challenges the juvenile court's order terminating his parental rights.

ISSUES

¶12    First, Father contends that the State violated its "statutory duties to notify [him] in a timely fashion[, which] resulted in a fundamentally unfair process." Second, Father contends that the juvenile court "facilitate[d] improper burden shifting, in violation of the due process clause, when it allowed a circumstance where the State made [Father] 'prove' paternity to [DCFS] before he was notified of any hearing." Third, Father

---

4. Mother failed to appear for trial, and the juvenile court ultimately terminated her parental rights. Mother is not a party to this appeal.

contends that "there was insufficient evidence that [he] abandoned [Child], or made merely 'token efforts.'"

ANALYSIS

I. Notice

¶13 Father first contends that "the State's violations of statutory duties to notify [him] in a timely fashion resulted in a fundamentally unfair process."[5] According to Father, "[t]he State had a duty to [notify him] of the adjudication on the initial Petition in 2014." (Citing Utah Code section 78A-6-310(1)(b).)

¶14 "The right to raise one's children is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution." *In re L.M.*, 2013 UT App 191, ¶ 12, 308 P.3d 553 (brackets, citation, and internal quotation marks omitted); *see also* Utah Code Ann. § 78A-6-503(1) (LexisNexis 2012) ("Under both the United States Constitution and the constitution of this state, a parent possesses a fundamental liberty interest in the care, custody, and management of the parent's child."). "Accordingly, that right may not be terminated without due process of law." *In re L.M.*, 2013 UT App 191, ¶ 12; *see also* U.S. Const. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]"); Utah Code Ann. § 78A-6-503(2) ("The court shall provide a fundamentally fair process to a parent if a party moves to terminate parental rights."). Due process requires, at a minimum, "adequate notice and an opportunity to be heard in a

---

5. We read Father's reference to "a fundamentally unfair process" to relate to Utah Code section 78A-6-503's requirement that "[t]he court shall provide a fundamentally fair process to a parent if a party moves to terminate parental rights." Utah Code Ann. § 78A-6-503(2) (LexisNexis 2012).

meaningful manner." *In re L.M.*, 2013 UT App 191, ¶ 12 (citation and internal quotation marks omitted).

¶15    Here, Father contends that the 2010 Order constituted "an adjudication order stating he was the father." Thus, according to Father, "[t]he State had a duty to [notify him] of the adjudication on the initial Petition in 2014." (Citing Utah Code section 78A-6-310(1)(b).) We first consider whether the 2010 Order constituted an adjudication of Father's paternity.

¶16    Pursuant to section 78B-15-601 of the Utah Uniform Parentage Act (the Parentage Act), "[a]n adjudicative proceeding may be maintained to determine the parentage of a child." Utah Code Ann. § 78B-15-601(1) (LexisNexis 2012); *see also id*. § 78B-15-102(1) ("'Adjudicated father' means a man who has been adjudicated by a tribunal to be the father of a child."). In a proceeding to adjudicate parentage, "a man whose paternity of the child is to be adjudicated" shall be joined as a party. *Id.* § 78B-15-603(2). Additionally, this court has previously observed that "[a]djudication is '[t]he legal process of resolving a dispute.'" *Kielkowski v. Kielkowski*, 2015 UT App 59, ¶ 16, 346 P.3d 690 (second alteration in original) (quoting *Adjudication*, Black's Law Dictionary 47 (9th ed. 2009)); *cf. id.* ¶ 18 (concluding that the district court did not adjudicate the husband's paternity where "[n]either party raised the parentage issue during the divorce proceedings" and the district court "simply entered a decree by default on a form that was automatically generated from [the husband's] verified petition and merely reiterated [the husband's] representation that there were 'no children at issue in this marriage'"); *Reller v. Reller*, 2012 UT App 323, ¶¶ 13–15, 291 P.3d 813 (concluding that the district court "had not previously adjudicated parentage" because a "perfunctor[y] recit[al] in a default divorce decree that there was one child resulting from the marriage does not elevate the question of paternity to one that 'the tribunal addresses' for purposes of the [Parentage Act]" (emphasis and citation omitted)).

¶17 Here, although the 2010 Order stated that Father "is the father of [Child]," this statement in the court's order did not constitute an adjudication of Father's paternity of Child under section 78B-15-601 of the Parentage Act. First, Father was not a party to the 2010 proceedings—a fact that he acknowledged below—as required by section 78B-15-603 to adjudicate parentage. *See* Utah Code Ann. § 78B-15-603(2). Second, Father's paternity of Child was not at issue in that case, and thus, there was no parentage dispute to be resolved, i.e., adjudicated. *See Kielkowski*, 2015 UT App 59, ¶ 16. Rather, the 2010 Order, titled "Findings of Fact, Conclusions of Law and Adjudication Order Re: Mother," was primarily concerned with Mother's behavior and the welfare of Child. Simply put, the juvenile court's statement that Father "is the father of [Child]" was nothing more than a restatement or, a "perfunctor[y] recit[al]," of the allegations in the State's 2010 verified petition. *See Reller*, 2012 UT App 323, ¶ 13. We therefore conclude that the 2010 Order was not an adjudication of Father's paternity of Child.

¶18 Having determined that the juvenile court did not adjudicate Father's paternity of Child in the 2010 Order, we turn to Father's claim that he was entitled to receive notification of the 2014 proceedings. Father asserts that "[t]he State had a duty to [notify him] of the adjudication on the initial Petition in 2014." According to Father, "the State skirted that duty by the [sleight] of hand in changing [his] status from 'father,' to 'alleged father.'"[6]

---

6. We note that with regard to this argument, Father does not allege judicial error. *See State v. Perkins*, 2014 UT App 60, ¶ 10, 322 P.3d 1184 ("[A] judicial error is one made in rendering the judgment and results in a substantively incorrect judgment." (citation and internal quotation marks omitted)). Rather, he alleges error on the part of DCFS.

In its oral ruling at trial, the juvenile court acknowledged that "the law requires that this be a fundamentally fair process

(continued…)

¶19   Father's notification argument hinges on a premise that we have rejected, namely that the 2010 Order constituted an adjudication of his paternity. However, because the 2010 Order did not constitute an adjudication of Father's paternity of Child, at the time Child was taken into DCFS custody in April 2014, Father was only a putative father.[7]

¶20   "Both the United States Supreme Court and the Utah Supreme Court have held that a putative father is not necessarily entitled to 'constitutionally protected parental rights.'" *In re S.H.*, 2005 UT App 324, ¶ 16, 119 P.3d 309 (quoting *In re adoption of B.B.D.*, 1999 UT 70, ¶ 10, 984 P.2d 967, and citing *Lehr v. Robertson*, 463 U.S. 248, 257–60 (1983)).

> "[W]hile it is true that the relationship between parent and child is afforded some protection by the federal and state constitutions, the rights of parents

_____

(…continued)
for parents of children" and that "the delays that arose out of [DCFS's] lack of contact in locating [Father] at the beginning of the case [were] concerning to the Court." The court further stated, "I'm hoping that in the efforts made to appoint [Father] counsel, giving him visits when he came, and providing an opportunity for him to have weekly phone contact, as well as an opportunity to present his case in Court today, that that helped remedy the delays that occurred, and [aided in the] effort to make this process fair to him and give him his due date in Court." But the court also stated that it was "not convinced that had [Father] been located in the first month or two that this case arose a year ago, that we would have had a different outcome here today."

7. A "putative father" is "[t]he alleged biological father of a child born out of wedlock." *Putative father*, Black's Law Dictionary (10th ed. 2014). This definition is similar to the Parentage Act's definition of "[a]lleged father." *Supra* ¶ 3 note 1.

are commensurate with the responsibilities they have assumed, and in the case of unmarried fathers, a biological relationship alone is insufficient to establish constitutionally protected rights."

*Id.* (quoting *In re adoption of B.B.D.*, 1999 UT 70, ¶ 10); *see also Lehr*, 463 U.S. at 260–61 ("Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." (emphasis, citation, and internal quotation marks omitted)).

¶21 In *In re adoption of B.B.D.*, our supreme court noted that "[u]nder Utah law, an unmarried biological father has an inchoate interest that acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood," which commitment is demonstrated by "establishing legal paternity, in accordance with the requirements of [Utah law]." 1999 UT 70, ¶ 11 (second alteration in original) (emphasis, citation, and internal quotation marks omitted); *see also In re adoption of B.Y.*, 2015 UT 67, ¶ 43, 356 P.3d 1215 ("An unwed father's rights are merely provisional. To perfect such rights a father must comply with legal prerequisites established by the state. Failure to do so leaves the father's parental rights without any substantive protection . . . ." (citations omitted)); *In re S.H.*, 2005 UT App 324, ¶ 15 n.3 (observing that Utah case law did not support the father's position that "standing and parental due process protections" should be extended to "any person claiming status as a *putative* father, even if that person has not taken any measures to substantiate his paternity claim").

¶22 The Parentage Act provides several methods by which "[t]he father-child relationship is established between a man and a child," including "an effective declaration of paternity by the man." Utah Code Ann. § 78B-15-201(2)(b) (LexisNexis 2012). Here, Father never attempted to file a declaration of paternity, and he did not take any steps to provide DCFS with proof of his

paternity of Child until December 5, 2014, when he provided DCFS with a "paternity paper" identifying him as Child's father. From that point forward, the juvenile court and DCFS recognized Father's paternity of Child,[8] and Father was notified of the proceedings regarding Child. Had Father wanted to secure constitutional protections as a parent earlier, filing a declaration of paternity was certainly a viable option. In addition, Father could have provided DCFS with the "paternity paper" much sooner than he did. Indeed, when Father and the DCFS caseworker spoke in September 2014, Father told her that he would provide proof of paternity within the week; however, he did not do so until December 5, 2014.

¶23　Moreover, although the juvenile court was on notice in April 2014 that Father was a potential father, the court was not required to notify him of any proceedings relating to Child. "'[T]he [federal] Constitution does not require either a trial judge or a litigant to give special notice to nonparties who are presumptively capable of asserting and protecting their own rights.'" *In re S.H.*, 2005 UT App 324, ¶ 21 (quoting *Lehr*, 463 U.S. at 265); *see also id.* (concluding that even where "the juvenile court was on notice that [the father] was a potential father," the court was "not required to provide him with special notice," because he "was capable of filing a voluntary declaration of paternity and preserving his rights as a parent to [the child]"). Because Father was capable of preserving his rights as a parent of Child well before December 2014, the juvenile court was not required to provide Father with notice before he did so.

---

8. Although DCFS and the juvenile court recognized Father's paternity of Child based on the "paternity paper" Father supplied to DCFS, both the State and the guardian ad litem assert that Father has never established legal paternity in Utah pursuant to one of the enumerated methods in Utah Code subsection 78B-15-201(2).

¶24 Lastly, Father argues that DCFS's "actions in bringing [him] into the proceeding set the State up to argue that [his] actions and responses demonstrated insufficient interest based on what would be expected of a normal parent." We are not persuaded that DCFS contributed to Father's lack of interest in Child. The juvenile court expressed concern regarding "the delays that arose out of [DCFS's] lack of contact in locating [Father] at the beginning of the case"; however, the court ultimately stated that it was "not convinced that had [Father] been located in the first month or two that this case arose a year ago, that we would have had a different outcome here today." And although the State could have done more to locate Father and bring him into the case earlier, the juvenile court did not rely on Father's absence from the initial 2014 proceedings as a basis for terminating his parental rights.

¶25 In sum, we conclude that the 2010 Order did not adjudicate Father's paternity of Child, and because Father was only a putative father at the start of the 2014 proceedings, he was not entitled to notice at that time.

## II. Burden to Prove Paternity

¶26 Father next contends that "the Court facilitate[d] improper burden shifting, in violation of the due process clause, when it allowed a circumstance where the State made [Father] 'prove' paternity to the Division before he was notified of any hearing." According to Father, "[i]n terminating [his] rights for inaction when his delay in entry into the case was due to the State requiring him to jump through hoops to prove to [DCFS that he] had established paternity, the Court facilitated improper burden shifting."

¶27 Father concedes that this issue was not preserved below and argues that we should address it under the exceptional-circumstances exception to the preservation rule. Father asserts that he "should be viewed as having established an 'exceptional circumstance,' for not raising this issue at trial in that the statutory scheme does not allow him to do so" and that, "[i]f all

deprivations of rights under the initial Petition are silenced by [the] filing of a Petition to Terminate, no argument can be made about the deprivations of those rights."

¶28 "The exceptional circumstances concept serves as a safety device, to assure that manifest injustice does not result from the failure to consider an issue on appeal." *State v. Irwin*, 924 P.2d 5, 8 (Utah Ct. App. 1996) (citation and internal quotation marks omitted); *see also In re adoption of K.A.S.*, 2016 UT 55, ¶ 19, 390 P.3d 278 (observing that the exceptional-circumstances exception is reserved "for the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would have resulted in manifest injustice" (citation and internal quotation marks omitted)). It is "used sparingly, properly reserved for truly exceptional situations, for cases . . . involving rare procedural anomalies." *Irwin*, 924 P.2d at 11 (citation and internal quotation marks omitted); *see also, e.g.*, *Salt Lake City v. Ohms*, 881 P.2d 844, 847 (Utah 1994) (concluding that exceptional circumstances existed because "the only way" to challenge the commissioner's authority was to first consent to that authority, through waiver, effectively agreeing not to object to that authority at trial, and then to obtain judicial consideration of the constitutionality of the commissioner's authority for the first time on appeal).

¶29 We conclude that the exceptional-circumstances doctrine does not aid Father. To begin with, Father's brief fails to adequately analyze this claim. Briefs require "not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998). "An issue is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." *Smith v. Smith*, 1999 UT App 370, ¶ 8, 995 P.2d 14 (citation and internal quotation marks omitted).

¶30 Here, Father makes two references to the exceptional-circumstances doctrine, stating that he "should be viewed as

having established an 'exceptional circumstance,'" and that "this Court should consider the requirement of exceptional circumstance[s] in presenting this issue for the first time on appeal." However, he fails to cite any authority regarding the doctrine, and as a consequence, he fails to discuss what that authority requires and to then explain how the facts of his case satisfy those requirements.

¶31 Rather, Father cursorily asserts that he was unable to raise his burden-shifting argument below. However, he has failed to adequately explain *why* he was unable to do so. Father has not asserted, and nothing in the record indicates, that he was actually barred from raising, or denied the opportunity to raise, the issue of burden-shifting in the juvenile court.[9] Father must do more than simply assert that he was unable to raise a claim below; he must demonstrate how the actual circumstances he encountered in the juvenile court process prevented him from raising the claim he asserts for the first time on appeal. Consequently, we conclude that Father has failed to demonstrate

---

9. After Father provided proof of his paternity of Child, the juvenile court appointed counsel to represent Father. *See* Utah Code Ann. § 78A-6-1111(1)(c) (LexisNexis Supp. 2014) ("If, in any action initiated by the state or a political subdivision of the state . . . , a parent or legal guardian requests an attorney and is found by the court to be indigent, counsel shall be appointed by the court to represent the parent or legal guardian in all proceedings directly related to the petition or motion filed by the state, or a political subdivision of the state[.]"); *In re S.H.*, 2005 UT App 324, ¶ 19 n.4, 119 P.3d 309 (observing that the father's right to counsel attached "[a]s soon as the court established that [he] was [the child's] biological father" and that "the court was under no obligation to provide him with counsel" before then, as he "had not established himself as a parent to [the child]"). Father's counsel could have raised this burden-shifting argument at trial.

exceptional circumstances that would justify his failure to preserve this claim in the juvenile court.

¶32   In any event, while the circumstances of Father's situation are unfortunate, they are not exceptional. Father contends that "[h]aving asserted paternity [in the 2010 proceedings], it was the State's obligation to prove it"; however, he has cited nothing in the way of support for this proposition. Rather, he cites to provisions pertaining to shelter hearings, adjudication and dispositional hearings, and pretrial hearings. And contrary to Father's assertion, the State did not bear the burden of establishing Father's paternity of Child. As previously discussed, "[u]nder Utah law, an unmarried biological father has an inchoate interest that acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood," which commitment is demonstrated by "establishing legal paternity, in accordance with the requirements of Utah law." *In re adoption of B.B.D.*, 1999 UT 70, ¶ 11, 984 P.2d 967 (brackets, emphasis, citation, and internal quotation marks omitted); *see also In re adoption of B.Y.*, 2015 UT 67, ¶ 43, 356 P.3d 1215 ("An unwed father's rights are merely provisional. To perfect such rights a father must comply with legal prerequisites established by the state. Failure to do so leaves the father's parental rights without any substantive protection . . . ." (citations omitted)). Given the foregoing, the burden of establishing paternity in a proceeding such as this is clearly on the claimant, not the State. Thus, we see nothing exceptional in the State's failure to notify Father of the proceedings involving Child before Father provided proof of his paternity.

### III. Sufficiency of the Evidence

¶33   Father contends that there was insufficient evidence to support the juvenile court's determination that he abandoned Child "or made merely 'token efforts' under [Utah Code section] 78A-6-507(1)(f)." When reviewing the decision to terminate parental rights, "we give the juvenile court a wide latitude of

discretion as to the judgments arrived at based upon not only the court's opportunity to judge credibility firsthand, but also based on the juvenile court judges' special training, experience, and interest in this field." *In re A.B.*, 2007 UT App 286, ¶ 10, 168 P.3d 820 (brackets, citation, and internal quotation marks omitted). Thus, "we will not disturb the juvenile court's findings and conclusions unless the evidence clearly preponderates against the findings as made or the court has abused its discretion." *In re R.A.J.*, 1999 UT App 329, ¶ 6, 991 P.2d 1118 (brackets, citation, and internal quotation marks omitted). "When a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435.

¶34 "Utah law requires a court to make two distinct findings before terminating a parent-child relationship." *In re R.A.J.*, 1999 UT App 329, ¶ 7. "First, the court must find that the parent is below some minimum threshold of fitness, such as finding that a parent is unfit or incompetent based on any of the grounds for termination under section [78A-6-507] of the Utah Code." *Id.* (citation and internal quotation marks omitted); *see also* Utah Code Ann. § 78A-6-507 (LexisNexis 2012) (listing the grounds for termination of parental rights and providing that the finding of a single enumerated ground will support the termination of parental rights). "Second, the court must find that the best interests and welfare of the child are served by terminating the parents' parental rights." *In re R.A.J.*, 1999 UT App 329, ¶ 7; *see also* Utah Code Ann. § 78A-6-506(3) (LexisNexis 2012). "A petitioner has the burden of establishing both of these elements by clear and convincing evidence." *In re R.A.J.*, 1999 UT App 329, ¶ 7; *see also* Utah Code Ann. § 78A-6-506(3). Here, Father does not challenge the juvenile court's determination that termination of his parental rights was in Child's best interest, and we therefore address only the parental fitness element of the statutory test.

¶35 Utah Code section 78A-6-507 provides, among other things, that a juvenile court may terminate parental rights if the

court finds that "the parent has abandoned the child" or that "only token efforts have been made by the parent . . . to support or communicate with the child." Utah Code Ann. § 78A-6-507(1)(a), (1)(f)(i). In terminating Father's parental rights, the juvenile court found, "based upon the un-rebutted testimony and clear and convincing evidence," that

> 1. [Child] came into the State's custody in April 2014 after extended periods of time where he stayed with [the foster] family. During the time [Child] stayed with [the foster] family there was no contact from [Father], and likewise in that period of time specifically prior to April 2014 but mostly from that point forward to today, the past thirteen months, there has been no financial support given by [Father], no birthday cards, and no inquiries into how [Child] was doing.
>
> 2. Once there was contact from the DCFS caseworker, . . . during the months of July to September 2014, it took [Father] months to provide the [paternity] paperwork which was ultimately provided in December 2014. During that period of time he did not seek a visit or inquire about [Child] until the Court hearing in January 2015.
>
> 3. Since having paternity recognized by the Court and DCFS, [Father] has had two visits and no phone calls. Efforts were made to arrange the schedule of the foster parents to accommodate weekly phone calls, however, [Father] did not take advantage of those. These facts and this behavior [are] not consistent with the normal interest that a parent would demonstrate in their child.
>
> . . . .

6. There was no contact between [Father] and the foster parents between the time of the voluntary placement and the time after [Father] appeared at the first hearing he attended, January, 2015[.]

7. There has been no support of [Child] by [Father] in the way of child support, gifts, cards, or anything of the like[.]

8. There were delays which arose out of [DCFS's] lack of contacting and locating [Father], which are concerning to the court[.]

. . . .

14. The Court is not convinced that if [Father] had been located and joined in the matter in a more timely fashion, that there would have been a different result[.]

15. [Father] did not request visitation until he attended Court in late January, 2015[.]

16. Since having paternity recognized by [DCFS], [Father] had two visits and no phone calls, despite the fact that efforts were made to provide him weekly phone calls with the minor[.]

The court then terminated Father's parental rights based on Utah Code subsections 78A-6-507(1)(a) and (1)(f), concluding that "grounds exist to terminate [Father's] parental rights and those grounds include abandonment . . . and the lack of [anything more than] token efforts." The court determined that for a period "in excess of six months," Father had "failed to communicate with [Child] by mail, telephone, or otherwise, and that [Father] . . . failed to show the affection of a natural parent without just cause." The court further determined that Father

had "not made anything more than token efforts to support or communicate with [Child]."

¶36    Father argues that the evidence was insufficient to support the juvenile court's determination that he abandoned Child. Under Utah law, "it is prima facie evidence of abandonment that the parent . . . failed to communicate with the child by mail, telephone, or otherwise for six months; [or] failed to have shown the normal interest of a natural parent, without just cause." Utah Code Ann. § 78A-6-508(1)(b), (1)(c) (LexisNexis 2012). The burden then shifts to the respondent parent to rebut the presumption of abandonment. *In re T.E.*, 2011 UT 51, ¶ 22, 266 P.3d 739. "In rebutting the presumption, respondent parents may present any evidence indicating that they did not consciously disregard their parental obligations or that their conduct did not lead to the destruction of the parent-child relationship." *Id.* We conclude that the evidence supports the juvenile court's finding that Father abandoned Child.

¶37    At trial, there was evidence that Father had failed to communicate with Child between at least July 2014 (when the DCFS caseworker first contacted Father) and January 2015 (when Father first came to a hearing)—around seven months. Child's foster father testified at trial that Child came to live with him in April 2014, and that from "when DCFS contacted [Father] in July" 2014 "until the termination of [Mother's parental rights in January 2015], when [Father] attended court," Father had no contact with the foster father.[10] The foster father also testified that he never received any phone calls, money, supplies, or cards from Father. In addition, the DCFS caseworker testified that Father had had no visits with Child between April 2014 and January 2015 and that Father had not sent any money, supplies, cards, or birthday cards to Child during that time. She also

---

10. Given that Child would have been five years old in July 2014, any communication between Father and Child would almost certainly have had to go through Child's foster family.

testified that Father "had no contact" with Child "between the time [she] had the case and January [2015]" and that Child "didn't receive any sort of money or supplies or anything" from Father. She further testified that her conversations with Father revolved around "Court dates" and that Father "never asked [her] how [Child] was doing in school, or how he was doing." Based on the foregoing, we conclude that the State made a prima facie showing of abandonment.

¶38    That showing shifted the burden to Father to show that he had not abandoned Child. *See In re T.E.*, 2011 UT 51, ¶ 22. Father presented no evidence to the juvenile court that he had any contact, direct or indirect, with Child between July 2014 and January 2015, nor did he present any evidence that he had even attempted to contact Child or his foster parents during that time. *See id.* ¶ 27 & n.35 (holding that attempts or efforts at communication do not qualify as communication pursuant to Utah Code subsection 78A-6-508(1), but that "they may be relevant to whether the respondent parent has rebutted the presumption of abandonment arising from the prima facie evidence and to whether the respondent parent has made more than 'token efforts' to communicate with the child"). Nevertheless, Father argues that he was "precluded from contact at least from . . . July 30th, 2014, in which the [DCFS] worker advised they 'didn't have paternity' on him and therefore, he was not being treated as father, provided the rights of a father, or joined in the case." He also argues that "during this time, it was [not] a 'lack of normal interest,' which kept [him] from communication with [Child]," and that "the 'just cause' for the lack of contact was that [DCFS] had the child in custody, and was demanding that [Father] prove paternity before he was *treated* as father, brought into the case, and viewed as being entitled to any contact with the minor." Father further claims that "there is no evidence that he was aware of [Child's] location." These arguments fall short of rebutting the presumption of abandonment.

¶39 Contrary to Father's assertion, there is no evidence that DCFS actively prevented him from communicating with or supporting Child. And the fact that DCFS had not yet recognized Father as Child's father or brought Father into the proceedings in no way prevented Father from communicating with or supporting Child, or inquiring about Child via his foster parents or the DCFS caseworker between July 2014 and January 2015. Moreover, Father's claim that he was unaware of Child's location demonstrates a lack of contact with Child and supports the juvenile court's finding that Father failed to show the normal interest of a natural parent. We conclude that the evidence amply supports the termination of Father's parental rights on the ground of abandonment.

¶40 We next address Father's related argument that there was insufficient evidence to support the termination of his parental rights based on only token efforts. As previously discussed, Utah Code section 78A-6-507 provides that a juvenile court may terminate parental rights if the court finds that "only token efforts have been made by the parent . . . to support or communicate with the child." Utah Code Ann. § 78A-6-507(1)(f)(i) (LexisNexis 2012).

¶41 Token efforts involve "minimal or superficial efforts given the parent's circumstances." *See In re T.E.*, 2011 UT 51, ¶ 37; *see also In re adoption of B.O.*, 927 P.2d 202, 209 (Utah Ct. App. 1996) ("'Token' is defined as 'merely simulated; slight or of no real account.'" (quoting *Webster's New Twentieth Century Dictionary* 1919 (2d ed. 1979))). The evidence supports the juvenile court's finding that Father made only token efforts to support or communicate with Child. *See* Utah Code Ann. § 78A-6-507(1)(f)(i).

¶42 Both the DCFS caseworker and Child's foster father testified that Father had not provided support for Child by way of money, supplies, or cards between July 2014 and January 2015. And Father concedes that "[t]hough [he] was provided the foster parents['] address after the January, 2015, hearing, he

provided nothing in the way of financial support, cards, or gifts to [Child] before the May, 2015, trial." Moreover, although Father had two visits with Child in January and February 2015 after having his paternity recognized, Father acknowledges that he failed to call Child "between early February and the trial date" in May. Indeed, the DCFS caseworker testified that she had "rearranged the [phone call] schedule" "so it worked for [Father]," but that he had called "[z]ero" times since she set up the new phone call schedule. Thus, the record evidence indicates that Father made no efforts to support Child, and that he made only "minimal or superficial efforts" to communicate with Child after his paternity was recognized in December 2014. *See In re T.E.*, 2011 UT 51, ¶ 37. We therefore conclude that the evidence amply supports the termination of Father's parental rights on the ground that Father made only token efforts to support or communicate with Child.

CONCLUSION

¶43   We affirm the juvenile court's order terminating Father's parental rights in Child.

―――――――――