2015 UT App 50

## THE UTAH COURT OF APPEALS

FLORENCIA VALENCIA,
Petitioner,
*v.*
LABOR COMMISSION, GRAPHIC PACKAGING, AND LIBERTY
INSURANCE CORPORATION,
Respondents.

Opinion
No. 20130976-CA
Filed February 26, 2015

Original Proceeding in this Court

Loren M. Lambert, Attorney for Petitioner

Jaceson R. Maughan, Attorney for Respondent
Labor Commission

Lori L. Hansen and Cody G. Kesler, Attorneys for
Respondents Graphic Packaging and Liberty
Insurance Corporation

JUDGE KATE A. TOOMEY authored this Opinion, in which
JUDGES J. FREDERIC VOROS JR. and STEPHEN L. ROTH concurred.

TOOMEY, Judge:

¶1 Florencia Valencia challenges a Utah Labor Commission (Commission) decision denying disability benefits for hearing loss she claims to have sustained while working for Graphic Packaging (Employer). We decline to disturb the Commission's decision.

BACKGROUND

¶2    Employer is a manufacturer of paperboard, recycled board, and folding carton packaging. According to her job description, Valencia inspected finished items as they came off the machines requiring her to work in a noisy environment. A number of professional workplace sound tests were conducted between 1988 and 2009, which showed sound emanating from the equipment and machines that ranged from 87 to 101 decibels. Valencia consistently wore hearing protection while she worked, which reduced the noise reaching her ears by at least 27 decibels.

¶3    Valencia did not have hearing problems when she began working for Employer in 1997, but in 2009 she had a lesion removed from her left ear and subsequent hearing tests showed she had hearing loss in both ears. Eventually, Valencia was diagnosed with "chronic tinnitus of the left ear" by Dr. Brian Peterson, who also opined that the noise levels at Valencia's workplace could have contributed to her condition. Another doctor, Dr. Carla H. Olsen, found no causal connection between the noise levels and the hearing loss.

¶4    Valencia filed an Application for Hearing on May 29, 2012, in which she requested workers' compensation benefits in the form of recommended medical care and permanent partial disability compensation for her hearing loss and chronic tinnitus.[1] In its answer, Employer claimed that Valencia could not demonstrate that her employment legally or medically caused her hearing loss.

¶5    In a pre-hearing memorandum, Valencia argued that Employer's professional sound surveys were unreliable because

---

1. She also requested travel expenses but eventually withdrew this claim.

many of the machines were idle when the surveys were conducted. Accordingly, she asked the Administrative Law Judge (ALJ) to order independent sound tests to be conducted when all machines were running normally. The ALJ denied this request because not only was it "undisputed that a professionally controlled sound test has [already] been conducted," but also "the machinery in which [Valencia] was stationed during her employment with [Employer] no longer exists at the plant." The ALJ concluded that "the professionally controlled sound tests that have been produced are the most probative."

¶6      After a hearing on Valencia's Application, the ALJ denied her request for benefits on the ground that she failed to establish legal causation for her hearing loss. Specifically, the ALJ concluded that, although the workplace machinery emitted "'harmful noise,'" Valencia's "consistent use of hearing protection ensured that she . . . was not exposed to harmful noise at [Employer's workplace] and she cannot show that her hearing loss was legally caused by her employment. Consequently, [her] claim cannot be deemed compensable."[2]

¶7      Valencia asked the Commission to review the ALJ's decision denying her benefits. The Commission affirmed, reasoning that "the concept of exposure, as it relates to hearing loss in [Utah Code section 34A-2-503], requires consideration of the noise Ms. Valencia actually heard during her employment. Whether Ms. Valencia wore hearing protection, then, is an implicit factor in determining what noise she had to hear." Valencia now seeks our review of the Commission's decision.

---

2. Having determined Valencia did not establish legal causation, the ALJ and the Commission did not address medical causation.

ISSUES AND STANDARDS OF REVIEW

¶8 Valencia argues that the Commission and the ALJ misinterpreted Utah Code section 34A-2-503 by treating hearing protection as a relevant factor in determining whether she was exposed to harmful industrial noise, as defined in section 34A-2-501. "We review statutory interpretations by agencies for correctness, giving no deference to the agency's interpretation . . . ." *Harrington v. Industrial Comm'n*, 942 P.2d 961, 963 (Utah Ct. App. 1997) (citation and internal quotation marks omitted); *see also Hughes Gen. Contractors, Inc. v. Labor Comm'n*, 2014 UT 3, ¶ 25, 322 P.3d 712.

ANALYSIS

¶9 Valencia argues that the Commission and the ALJ misinterpreted Utah Code section 34A-2-503 by treating hearing protection as a relevant factor in determining whether she had been "exposed" to "harmful industrial noise, as defined in Section 34A-2-501." According to Valencia, such an interpretation "violates the plain language of the statute" and adds language the legislature did not intend. Instead, she contends, the statutory prerequisite is shown merely by demonstrating that "her person" was "exposed to noise levels . . . defined [by the statute] as 'harmful industrial noise.'" Under Valencia's interpretation, the effectiveness of her hearing protection would be relevant only during the analysis of medical causation: whether her exposure to the noise in fact caused her hearing loss. Employer responds that the concept of "exposure" necessarily includes taking into account hearing protection.

¶10 "When interpreting a statute, our goal is to give effect to the legislature's intent and purpose." *Francis v. State*, 2013 UT 65, ¶ 41, 321 P.3d 1089 (citation and internal quotation marks omitted). "To determine that intent, we look to the plain language of the statute, reading it as a whole and interpreting its

provisions to ensure harmony with other provisions in the same chapter and related chapters." *R.P. v. K.S.W.*, 2014 UT App 38, ¶ 15, 320 P.3d 1084. We presume the legislature used each term in the statute advisedly and according to its ordinary meaning. *State v. Maestas,* 2002 UT 123, ¶ 52, 63 P.3d 621. Additionally, our supreme court has noted that discerning the ordinary meaning of a term may start with the dictionary since it catalogues "a range of possible meanings that a statutory term may bear." *Hi-Country Prop. Rights Group v. Emmer*, 2013 UT 33, ¶ 19, 304 P.3d 851.

¶11   Utah Code section 34A-2-503(1) provides, "Permanent hearing loss caused by exposure to harmful industrial noise . . . shall be compensated according to the terms and conditions of this chapter or Chapter 3, Utah Occupational Disease Act." Elsewhere, the statute defines "harmful industrial noise" as "the sound emanating from equipment and machines during employment exceeding" specified decibels over identified durations from fifteen minutes to eight hours. Utah Code Ann. § 34A-2-501(1)(b) (LexisNexis 2011). The statute also provides how a claimant must demonstrate that the sound emanating from the machines exceeded prescribed limits: "by a professionally controlled sound test." *Id.* § 34A-2-503(2).

¶12   The word "emanate" means "to come out from a source," *Webster's Third New Int'l Dictionary* 738 (1993), and its use in the context of this statute refers to the level of the noise as measured at the machines. Therefore, noise is harmful if it comes out of the machine above certain decibel levels beyond specified periods.

¶13   Because the statute defines harmful industrial noise but not "exposure," our focus is upon what it means to be exposed to that noise. To "expose" means: "to lay open (as to . . . danger . . .)"; "make accessible to something that may prove detrimental"; and "deprive of shelter, protection, or care." *Webster's Third New Int'l Dictionary* 802 (1993). Using the plain meaning of the word within the context of the phrase "exposure

to harmful industrial noise," "exposure" means being placed at risk from the harmful sound.

¶14    This interpretation finds support in *State v. Gallegos*, a child endangerment case in which the Utah Supreme Court explained that the Black's Law Dictionary definition of "expose" "suggests that there must be a showing of a real, physical risk of harm, not simply exposure to the image of a controlled substance, chemical substance, or drug paraphernalia." 2007 UT 81, ¶ 13, 171 P.3d 426. The court construed the word "exposed" in the context of the child endangerment statute:

> [T]here must be an actual risk of harm to a child in order for conduct to constitute "exposure" under the statute. Because an actual risk of harm is required, exposure must go beyond mere visual or auditory exposure . . . . The child must have a reasonable capacity to access the substance in order for a real risk of harm to exist.

*Id.* ¶¶ 14–15.

¶15    Based on the concept of placing someone at risk, determining whether the harmful industrial sound exposes a worker to risk must take into account anything that would interfere with the sound reaching the worker's ear. So, for example, if the sound emanating from the machines constitutes harmful industrial noise as defined by the statute, but the worker is not near the machines and instead is separated from them by distance and a wall, the decibels reaching the worker's ears might fall below what is defined as harmful. Under this scenario, the worker is not exposed to the harmful industrial noise.

¶16    We conclude that the ALJ and the Commission correctly reasoned that hearing protection must be considered when determining whether an employee has been exposed to harmful

industrial noise. Hearing protection diminishes the sound reaching the human ear, and because of this, the harmful noise is reduced. Accordingly, consideration of Valencia's use of hearing protection is relevant and necessary to determining whether she was exposed to harmful industrial noise.

¶17   The question, then, is whether Valencia met the statutory prerequisite of showing she was exposed to harmful industrial noise. The professional sound tests established the emanation of harmful industrial noise from the machinery.[3] But by consistently using ear protection, Valencia reduced the gross decibel levels in the environment to a net level reaching her ear below what the statute specifies as harmful. She, therefore, has not established the statutory requirement for showing that she was exposed to the harmful industrial noise. Accordingly, her claim was properly denied.

---

3. Valencia also argues that additional sound testing was required because the prior tests were unreliable. Nevertheless, Valencia failed to challenge the ALJ's decision not to order additional sound tests to the Commission. In moving for review, Valencia had "the obligation to raise all the issues that could have been presented at that time, and those issues not raised were waived." *See Pease v. Industrial Comm'n*, 694 P.2d 613, 616 (Utah 1984). Had she raised the issue, the Commission could have adjudicated whether the ALJ abused its discretion in not ordering additional tests. *See id.* Thus, Valencia has waived this issue. *See Ashcroft v. Industrial Comm'n*, 855 P.2d 267, 268–69 (Utah Ct. App. 1993) (holding that a challenge to the sufficiency of evidence was waived when the petitioner failed to raise it on review to the Commission).

CONCLUSION

¶18    In sum, a person's exposure to harmful industrial noise necessarily takes into account the use of hearing protection. In this case, although harmful industrial noise emanated from the machinery, Valencia's hearing protection reduced her exposure to a noise level below that which the statute defines as harmful. Consequently, Valencia has not met the statutory prerequisite for establishing her claim, and therefore we decline to disturb the Commission's decision.

———————