2017 UT App 131

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF L.A.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

J.R.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20151005-CA
Filed July 28, 2017

Third District Juvenile Court, Salt Lake Department
The Honorable Mark W. May
No. 1108194

Colleen K. Coebergh, Attorney for Appellant

Sean D. Reyes and John M. Peterson, Attorneys
for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES J. FREDERIC VOROS JR. and STEPHEN L. ROTH
concurred.

CHRISTIANSEN, Judge:

¶1    J.R. (Father) appeals the juvenile court's order terminating
his parental rights in L.A. (Child). We affirm.

BACKGROUND

¶2    This appeal concerns Father's right to parent Child.
Child's mother (Mother) admitted to using drugs during her

pregnancy, and Child tested positive for drugs at her birth in November 2014. A few days after Child was born, the Division of Child and Family Services (DCFS) filed a verified petition alleging that Child was abused and neglected. The petition further alleged, "Paternity has not been established. [J.R.] may be the father of the child. He is currently incarcerated at the Salt Lake County Metro Jail."

¶3     That same day, the juvenile court held a shelter hearing. Father was transported from the jail to the shelter hearing. At the hearing, the State indicated to the court that Father wished to have DNA testing done. The court therefore "order[ed] that DNA testing be done" and instructed Father to "[c]ooperate with DCFS in getting that taken care of." The court also asked Father how long he "anticipate[d] being incarcerated" and told him, "[I]f you get out [of jail], make sure you get ahold of DCFS so they can follow through with the testing." The court's written order, which was prepared by the State, provided, "The Court further orders that: the child and father submit to DNA testing to establish paternity."

¶4     Subsequently, the case was transferred to another juvenile court judge, and over the course of the next few months, four child welfare hearings took place.[1] Father was not transported to any of these hearings. The issue of Father's paternity arose during several of the hearings, but each time the issue was discussed, it was determined that Father had not yet established paternity. On March 3, 2015, Father was released from jail. Shortly thereafter, he went to the Office of Recovery Services (ORS) and underwent DNA testing.

¶5     Father appeared at the next child welfare hearing, held on April 28. At the hearing, DCFS requested that the juvenile court

---

1. A third juvenile court judge presided over two of these hearings, held on January 15, 2015, and February 19, 2015. Judge May presided over the remaining proceedings in this case.

terminate reunification services to Mother, but the court instead continued reunification services for Mother and Child and set a permanency hearing for July 2015. In addition, the court provisionally appointed Father's current counsel.

¶6   On July 7, 2015, the juvenile court held a permanency hearing to determine whether Child could be returned to Mother. DCFS again asked the court to terminate Mother's reunification services, which the court ultimately did. After initially declining to permanently appoint Father's current counsel, the court appointed her to represent Father. During the hearing, there was also a discussion regarding Father's attempts to establish paternity. The State noted that ORS wanted to include Mother in its DNA testing and that Mother had not been cooperating. Counsel for Father's parents further noted that ORS would not conduct a DNA test of Mother because she did not have a valid form of identification. After expressing confusion as to why ORS needed Mother to conduct a DNA test regarding Father's paternity (rather than comparing Child's and Father's tests) and noting that "ORS is throwing up roadblocks," the juvenile court told Father, "I don't know why you haven't filed a voluntary declaration of paternity, . . . I mean, really, that's—how simple is that? Could have been done months ago."

¶7   That same day, Father and Mother filed affidavits stating that Father is Child's biological father. The next day, Father filed a motion to adjudicate his paternity. The court granted Father's motion and adjudicated Father as the legal father of Child on August 13. Father was again incarcerated on September 7.

¶8   On September 28, the State filed an amended petition to terminate both Mother's and Father's parental rights. The juvenile court held a termination trial on November 12.[2] Father

---

2. Mother voluntarily relinquished her parental rights at the beginning of the termination trial and has no involvement in this appeal.

testified during the trial about his incarceration and his efforts to establish paternity of Child.

¶9     On November 20, 2015, the juvenile court entered an order terminating Father's parental rights. The court found, in relevant part:

> At the November, 2015 trial, [Father] complained that he was not transported to the December 16, 2014 hearing and that [DCFS] never came to collect a DNA sample. [Father] was not transported to the hearing because he was not a party to the action. Additionally, there was no order that [DCFS] collect [Father's] DNA or pay for the testing. [DCFS] originally alleged and [Mother] subsequently admitted that paternity had not been established. [Father] was suspected of being the father but ultimately it was his responsibility to establish legal paternity.

The court further found that while it was concerning that Father took "nearly nine months to establish paternity . . . , what is more concerning is [Father's] inability to remain out of jail." The court then concluded that pursuant to Utah Code subsection 78A-6-507(1)(d), Father's "habitual incarceration demonstrated his inability or unwillingness to remedy the circumstances that caused [Child] to be in an out-of-home placement." The court also concluded that it was in Child's best interest to terminate Father's parental rights.

¶10     Father subsequently filed a motion pursuant to rule 52(b) of the Utah Rules of Civil Procedure, requesting clarification of the juvenile court's termination order. Among other things, Father requested clarification regarding "[w]hat obligation does [DCFS] have after alleging paternity, and hearing an order to have the child tested to determine paternity, to act on and comply with that Order" and "[w]hat obligations do [DCFS] and [the] Court have, after allowing the appearance of an alleged

father at a child welfare hearing, to secure his appearance at future hearings, particularly when that alleged father is incarcerated." The juvenile court denied Father's motion, concluding: "The Findings of Fact were sufficiently detailed and included enough facts to disclose the process through which the ultimate decision was reached. There was no allegation that any facts, conclusions or orders were clearly erroneous. This Court does not find that any clarification is needed."

¶11     Father now appeals the juvenile court's order terminating his parental rights.


## ISSUES

¶12     First, Father contends that "the Order for DNA testing, and subsequent inaction toward testing and/or out and out resistance to testing and other avenues of establishment of paternity resulted in a fundamentally unfair process." Second, he contends that there was insufficient evidence to support the juvenile court's determination that he was "'unfit' pursuant to section 78A-6-507(1)(d)" of the Utah Code.


## ANALYSIS

### I. DNA Testing

¶13     Relying on Utah Code subsection 78A-6-503(2), Father contends that "the Order for DNA testing, and subsequent inaction toward testing and/or out and out resistance to testing and other avenues of establishment of paternity resulted in a fundamentally unfair process." *See generally* Utah Code Ann. § 78A-6-503(2) (LexisNexis Supp. 2016) ("The court shall provide a fundamentally fair process to a parent if a party moves to terminate parental rights."). According to Father, "[t]his Court should recognize the inherent statutory and fundamental duty the State has to identify, notice, and serve parents and bring

them into such cases so that their statutory and fundamental due process rights can be guaranteed." The State characterizes this issue as "[w]hether the juvenile court or [the] State had any obligation to assist [Father] in establishing paternity." The guardian ad litem contends that Father's due process claim was not preserved below.

¶14 "Like the Utah Supreme Court, 'we are resolute in our refusal to take up constitutional issues which have not been properly preserved, framed and briefed[.]'"*Salt Lake County v. Butler, Crockett & Walsh Dev. Corp.*, 2013 UT App 30, ¶ 32, 297 P.3d 38 (quoting *Brigham City v. Stuart*, 2005 UT 13, ¶ 14, 122 P.3d 506, *rev'd on other grounds*, 547 U.S. 398 (2006)). To preserve an issue for appeal, "the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (citation and internal quotation marks omitted). "The preservation rule applies to every claim, including constitutional questions[.]" *Seamons v. Brandley*, 2011 UT App 434, ¶ 3, 268 P.3d 195 (per curiam). "Among other things, this standard requires that the issue be 'specifically raised.'" *Butler*, 2013 UT App 30, ¶ 32 (quoting *438 Main St.*, 2004 UT 72, ¶ 51). "Where there is no clear or specific objection and the specific ground for objection is not clear from the context[,] the theory cannot be raised on appeal." *State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 (alteration in original) (citation and internal quotation marks omitted). "Thus, if a party makes an objection at trial based on one ground, this objection does not preserve for appeal any alternative grounds for objection." *Id.*

¶15 "'When a party raises an issue on appeal without having properly preserved the issue below, we require that the party articulate an appropriate justification for appellate review[.]'" *Butler*, 2013 UT App 30, ¶ 33 (quoting *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171). Our supreme court has "recognized only three instances in which an appellate court may address an issue for the first time on appeal": "(1) where the appellant establishes that the trial court committed plain error; (2) where exceptional

circumstances exist; or (3) in some situations, where a claim of ineffective assistance of counsel is raised on appeal." *In re C.C.*, 2013 UT 26, ¶ 17, 301 P.3d 1000 (brackets, citations, and internal quotation marks omitted). Accordingly, the Utah Rules of Appellate Procedure require an appellant's brief to contain a "citation to the record showing that the issue was preserved in the trial court" or "a statement of grounds for seeking review of an issue not preserved in the trial court." Utah R. App. P. 24(a)(5)(A), (B).

¶16 Father's brief contains no citation to the record demonstrating that his due process claim was preserved in the juvenile court, nor does our review of the record indicate that it was. Moreover, Father does not invoke an exception to the preservation rule. *See Butler*, 2013 UT App 30, ¶ 33. Consequently, this claim is not properly before us.

¶17 Nevertheless, the record indicates that several of Father's subarguments on appeal were raised below outside of the due process context. More specifically, Father argues that (1) after the shelter hearing, he should have been transported to the hearings regarding Child, and (2) it was DCFS's responsibility to ensure that DNA testing of Father and Child occurred. We address each issue in turn.

¶18 First, Father notes that after the shelter hearing, he "was not transported to hearings and didn't appear until the end of April, 2015" and asserts that "[i]t is troubling that after bringing [him] into the proceeding by service and transportation to [the shelter hearing], [he] was effectively excluded from four hearings by virtue of the fact that no transportation order was submitted to the Court." Father's argument is inadequately briefed. An appellant's brief must contain "the contentions and reasons of the appellant with respect to the issues presented, . . . with citations to the authorities, statutes, and parts of the record relied on." Utah R. App. P. 24(a)(9). To comply with this rule, "[b]riefs must contain reasoned analysis based upon relevant legal authority. An issue is inadequately briefed

when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." *State v. Davie*, 2011 UT App 380, ¶ 16, 264 P.3d 770 (citation and internal quotation marks omitted). In this case, Father has not cited any authority nor provided any legal analysis in support of his argument that he should have been transported to the hearings regarding Child even though he had not yet established his paternity at the time of the hearings in question. Consequently, Father has not carried his burden of persuasion on appeal.

¶19    Second, Father contends that "the transcript of the shelter hearing makes [it] very clear that the Court placed upon [DCFS] a burden to facilitate the DNA testing" and that the court's written order—prepared by the State—"changed the tenor of the Order to omit the obligation placed on the State to see the DNA testing through." Father also asserts that DCFS was, at best, "half-heartedly participating in the [DNA] testing" and that although "the State was aware of [Mother's] lack of identification and . . . ORS's resistance or failure to complete the testing, . . . it did nothing to timely address the matter with the Court." Father implies that these circumstances delayed his ability to establish paternity and that the delay was later used against him to support the termination of his parental rights.

¶20    At the shelter hearing, the juvenile court addressed the issue of DNA testing:

> [Court]: Okay, at this point it doesn't appear that [Father] has been—paternity is still in question; is that right?
>
> [State's counsel]: That is correct, your Honor. My understanding is that he would like DNA testing done so [DCFS] will have to set that up through ORS.
>
> [Court]: All right, is that accurate[?]

[Father]: (No verbal response).

[Court]: All right, I'll order that DNA testing be done. Cooperate with DCFS in getting that taken care of[.]

. . . .

[Court]: [H]ow long do you anticipate being incarcerated?

[Father]: I don't know (inaudible).

. . . .

[Father]: Oh, I have no idea. I'm in [on] a probation violation. (Inaudible).

[Court]: Okay.

[Father]: I want to do whatever it takes to get her back.

[Court]: Well, if you get out, make sure you get ahold of DCFS so they can follow through with the testing, okay?

The juvenile court's final written order simply stated, "The Court further orders that: the child and father submit to DNA testing to establish paternity."

¶21    At trial, Father testified, "[T]hey ordered . . . a DNA test when I was in jail. They never came through." And during closing argument, Father's counsel asserted that "[n]obody who sought the order, nor the Court who . . . signed off on the order that Dad and child get a [DNA] test did anything about it." In its order terminating Father's parental rights, the juvenile court found that "there was no order that [DCFS] collect the father's

DNA or pay for the testing" and that "ultimately it was [Father's] responsibility to establish legal paternity."

¶22 We first address Father's contention that the juvenile court's written order "changed the tenor of the Order to omit the obligation placed on the State to see the DNA testing through." After reviewing the court's oral ruling from the shelter hearing and its final written order, we are persuaded that the two rulings, while not entirely in conflict, do contain some confusing discrepancies. *See generally M.F. v. J.F.*, 2013 UT App 247, ¶ 6, 312 P.3d 946 ("Our case law is clear that where a court's oral ruling differs from a final written order, the latter controls."). Specifically, at the shelter hearing, the juvenile court "order[ed] that DNA testing be done" and told Father to "[c]ooperate with DCFS in getting that taken care of." Given this language, along with the facts that the successful completion of DNA testing would require at least some effort on the part of the appropriate testing agency (either DCFS or ORS) and that Father was incarcerated at that time, it was not wholly unreasonable for Father to believe that DCFS might seek him out to complete the DNA testing and that he was only required to cooperate with DCFS in its efforts to do so.[3] On the other hand, at the shelter hearing, the court asked Father how long he "anticipate[d] being incarcerated" and told him: "Well, if you get out, make sure you get ahold of DCFS so they can follow through with the testing, okay?" This statement, along with the court's final written order requiring "the child and father submit to DNA testing to establish paternity," should have put Father on notice that DCFS was not required to seek him out to complete the DNA testing and that it was his responsibility to contact DCFS once he got out of jail.

---

3. In addition, while not a part of the court's oral ruling, during the shelter hearing, the State observed that Father wanted to have DNA testing done and that "[*DCFS*] *will have to set that up* through ORS." (Emphasis added.)

¶23    In any event, we do not perceive any resulting harm to Father. Father took the steps necessary to establish paternity when, in July 2015, he filed a motion to adjudicate his paternity, accompanied by sworn statements from both Father and Mother that he is Child's biological father. *See* Utah Code Ann. §§ 78B-15-201(2)(c), -615 (LexisNexis 2012). Thereafter, on August 13, the juvenile court granted Father's motion and adjudicated him as the legal father of Child.

¶24    We acknowledge, and the State concedes, that "Father may have been hampered in establishing his paternity due to his incarceration." But "means other than genetic testing were available to [Father] to establish his paternity," *see In re S.H.*, 2005 UT App 324, ¶ 20, 119 P.3d 309, a fact which Father recognizes. Indeed, in his briefing, Father concedes that "DNA testing is but one method of establishing legal paternity under Utah law," and he acknowledges the existence of several alternative methods for establishing paternity, including an adjudication of paternity and a voluntary declaration of paternity.[4] *See* Utah Code Ann. § 78B-15-201(2)(b), (c). And while the juvenile court's order terminating Father's parental rights

4. Although Father concedes that there are methods other than DNA testing sufficient to establish paternity, he argues that "his avenues for establishing paternity were not outlined for him at the outset on the record" and that "he [should have] been properly notified of mechanisms to establish paternity rather than being steered toward DNA testing the State had no intention of providing." However, the record indicates that Father initially told the court that *he* wanted to pursue DNA testing. In any event, this claim is inadequately briefed. Father has not cited any authority or provided any legal analysis in support of his assertion that the juvenile court had an affirmative duty to inform him of alternative methods of establishing paternity. Consequently, Father has not carried his burden of persuasion on this point.

notes that it took Father "nearly nine months to establish paternity," the order also indicates that the court did not substantially rely on the amount of time it took Father to establish paternity in terminating his parental rights.

¶25   Rather, as will be discussed in more detail below, *infra* ¶ 30, the juvenile court terminated Father's parental rights because Father's actions, specifically his "inability to remain out of jail," demonstrated that he was unable to remedy the conditions giving rise to Child's out-of-home placement. Pursuant to Utah Code subsection 78A-6-507(1)(d), the juvenile court determined that Child was being cared for in a foster home, that "there was still no legal parent *able to properly care for* [*Child*] nor had there been in a year"; that Father's "habitual incarceration demonstrated his inability or unwillingness to remedy the circumstances that caused [Child] to be in an out-of-home placement"; and that because Father would be incarcerated until May 14, 2016, he was not capable of taking care of Child in the near future. (Emphasis added.) Thus, we conclude that any delay Father experienced in establishing his parental rights was ultimately harmless.

¶26   Moreover, we agree with the State that, as a general matter, "the onus of establishing paternity rests upon the alleged father." The Utah Supreme Court has stated that "the rights of parents are commensurate with the responsibilities they have assumed, and in the case of unmarried fathers, a biological relationship alone is insufficient to establish constitutionally protected parental rights." *In re adoption of B.B.D.*, 1999 UT 70, ¶ 10, 984 P.2d 967; *see also Lehr v. Robertson*, 463 U.S. 248, 260 (1983) ("Parental rights do not spring full-blown from the biological connection between parent and child." (emphasis, citation, and internal quotation marks omitted)). "Under Utah law, an unmarried biological father has an inchoate interest that acquires constitutional protection only when *he* demonstrates a timely and full commitment to the responsibilities of parenthood . . . ." *In re adoption of B.B.D.*, 1999 UT 70, ¶ 11 (emphasis added) (citation and internal quotation marks

omitted). "An unmarried father demonstrates his commitment to the responsibilities of parenthood . . . by *establishing legal paternity, in accordance with the requirements of [Utah law].*" *Id.* (alteration in original) (citation and internal quotation marks omitted). Had Father wanted to secure constitutional protections as a parent earlier, it was within his power to do so. *See In re S.H.*, 2005 UT App 324, ¶ 20 (observing, where the mother delayed in submitting her DNA sample, that "means other than genetic testing were available to [the father] to establish his paternity" and that it "was completely within [his] control to file a voluntary declaration of paternity and thus guarantee[] that he would receive [constitutional protection]" (second, third, and fourth alterations in original) (citation and internal quotation marks omitted)). Indeed, as the juvenile court noted, Father could have filed a voluntary declaration of paternity "months" before he did so.

¶27    In sum, we conclude that Father's due process claim was not preserved; that Father's arguments pertaining to his lack of transportation to the hearings regarding Child and the juvenile court's duty to inform him of alternative methods of establishing paternity are inadequately briefed; and that any discrepancies between the court's oral and written rulings regarding DNA testing, and any delays resulting therefrom or otherwise, were harmless. We ultimately agree with the State that it was Father's responsibility alone to establish paternity.

## II. Sufficiency of the Evidence

¶28    Father contends that there was insufficient evidence to support the juvenile court's determination that he was "'unfit' pursuant to [section] 78A-6-507(1)(d)" of the Utah Code. "Findings of fact in a parental rights termination proceeding are overturned only if they are clearly erroneous." *In re G.B.*, 2002 UT App 270, ¶ 9, 53 P.3d 963 (citation and internal quotation marks omitted). Under this standard, we will set aside the juvenile court's findings of fact only "if the findings . . . are against the clear weight of the evidence, or if [we] otherwise

reach[] a definite and firm conviction that a mistake has been made." *In re S.L.*, 1999 UT App 390, ¶ 20, 995 P.2d 17 (omission in original) (citation and internal quotation marks omitted).

¶29    "Utah law requires a court to make two distinct findings before terminating a parent-child relationship." *In re R.A.J.*, 1999 UT App 329, ¶ 7, 991 P.2d 1118. "First, the court must find that the parent is below some minimum threshold of fitness, such as finding that a parent is unfit or incompetent based on any of the grounds for termination under [section 78A-6-507] of the Utah Code." *Id.* (citation and internal quotation marks omitted); *see also* Utah Code Ann. § 78A-6-507 (LexisNexis 2012) (listing the grounds for termination of parental rights and stating that the finding of a single enumerated ground will support the termination of parental rights). "Second, the court must find that the best interests and welfare of the child are served by terminating the parents' parental rights." *In re R.A.J.*, 1999 UT App 329, ¶ 7; *see also* Utah Code Ann. § 78A-6-506(3) (LexisNexis 2012). "A petitioner has the burden of establishing both of these elements by clear and convincing evidence." *In re R.A.J.*, 1999 UT App 329, ¶ 7; *see also* Utah Code Ann. § 78A-6-506(3). Father does not challenge the juvenile court's ruling that termination of his parental rights was in Child's best interest, and we therefore address only the parental fitness element of the statutory test.

¶30    Utah Code section 78A-6-507 provides, among other things, that a juvenile court may terminate parental rights if the court finds that (1) "the child is being cared for in an out-home-placement under the supervision of the court"; (2) "the parent has substantially neglected, willfully refused, or has been unable or unwilling to remedy the circumstances that cause the child to be in an out-of-home placement"; and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care in the near future." Utah Code Ann. § 78A-6-507(1)(d). In terminating Father's parental rights, the juvenile court observed that it was concerned about Father's "inability to remain out of jail," and that Child would be eighteen months old by the time Father was released from jail.

The court also noted that "just because someone is released from jail does not mean they are ready to parent a young child" and that "[Father] would likely need some services before he would be an appropriate parent." As an example, the court observed that Father had "testified his drug tests were clean until he 'fell back'" and that Father "appears to have a substance abuse issue that needs to be addressed." The court observed that Father's probable need for services meant that Child "would be more than 18 months old before [Father] is ready to be a parent." The court ultimately terminated Father's parental rights based on Utah Code subsection 78A-6-507(1)(d), after finding by clear and convincing evidence that

> (1) [Child] is being cared for in a foster home under the supervision of [DCFS] and the Court;

> (2) [Father] has been unwilling or unable to remedy the circumstances that caused [Child] to be placed in [DCFS's] custody. At the time of the November, 2015 trial, there was still no legal parent able to properly care for [Child], nor had there been in nearly a year. Also, [Father's] habitual incarceration demonstrated his inability or unwillingness to remedy the circumstances that caused his child to be in an out-of-home placement.

> (3) Given that [Father] will be incarcerated until May 14, 2016, he will not be capable of exercising proper and effective parental care of [Child] in the near future.

We conclude that the record evidence supports the juvenile court's determination that Father was unable to remedy the circumstances that caused Child to be in an out-of-home placement and that there was a substantial likelihood that Father would not be capable of exercising proper and effective parental care in the near future.

¶31    Father concedes that because "[Child] was in a legal risk foster placement, the first subpart [of subsection 78A-6-507(1)(d)] is not at issue." With respect to the second and third requirements of subsection 78A-6-507(1)(d), Father challenges two of the juvenile court's findings, which, according to Father, are "simply insufficient to demonstrate that he had . . . 'been unwilling to remedy the circumstances that caused [Child] to be in an out-of-home placement; and . . . that there is a substantial likelihood that [he] will not be capable of exercising proper and effective parental care in the near future.'" (Quoting Utah Code Ann. § 78A-6-507(1)(d) (LexisNexis 2008).)

¶32    First, Father challenges the juvenile court's finding that he "would likely need some services before he could be an appropriate parent" and the court's reference to Father's possible need for drug treatment. More specifically, according to Father, the juvenile court did not, and could not find, "based on the record, 'habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render the parent unable to care for the child.'" (Quoting Utah Code Ann. § 78A-6-508(2)(c) (LexisNexis 2008).) Regarding Father's drug use, the court observed that "[Father] testified his drug tests were clean until he 'fell back'" and that Father "appears to have a substance abuse issue that needs to be addressed." Father concedes that "[t]he evidence seems to suggest use on one occasion of some unknown substance," but he contends that "[t]estimony of clean tests and then a 'slip' is legally insufficient for the Court to find by clear and convincing evidence 'habitual or excessive use'" under subsection 78A-6-508(2)(c) of the Utah Code.

¶33    As Father correctly observes, the juvenile court did not find "'habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render the parent unable to care for the child.'" (Quoting Utah Code Ann. § 78A-6-508(2)(c).) Nor was it required to do so. Utah Code subsection 78A-6-508(2) lists several "circumstances, conduct, or conditions," including habitual or excessive drug use, that courts may consider "[i]n determining whether a parent or parents are *unfit or have*

*neglected a child.*" Utah Code Ann. § 78A-6-508(2) (LexisNexis Supp. 2016) (emphasis added). Thus, we read the circumstances listed under subsection 78A-6-508(2) to apply to two specific grounds for termination under subsection 78A-6-507(1)—whether a parent is "unfit or incompetent" pursuant to subsection 78A-6-507(1)(c), and whether a parent "has neglected or abused the child" pursuant to subsection 78A-6-507(1)(b). *See id.* § 78A-6-507(1)(b), (c) (LexisNexis 2012).

¶34 Here, although the juvenile court used the term "Unfitness" as a section heading to describe the ground for terminating Father's parental rights, the court did not terminate Father's parental rights on the grounds that he was "unfit or incompetent" or that he had "neglected or abused" Child. *See id.* Instead, the juvenile court relied on the threefold test set forth in subsection 78A-6-507(1)(d).[5] *Supra* ¶ 30. But more importantly, the record demonstrates that the juvenile court noted Father's need for additional services—due to, for example, his "substance abuse issue"—not as an independent basis for terminating Father's parental rights, but because that need would further delay Father's ability to take and care for Child after his incarceration ended. Accordingly, Father's argument regarding habitual or excessive drug use under Utah Code subsection 78A-6-508(2) is misplaced.

---

5. Even if we were to conclude that the circumstances listed under subsection 78A-6-508(2) constituted evidence of grounds for termination under subsection 78A-6-507(1)(d), a juvenile court is not limited to the enumerated circumstances in subsection 78A-6-508(2) in determining whether there is evidence of grounds for termination of parental rights. *See* Utah Code Ann. § 78A-6-508(2) (LexisNexis Supp. 2016) ("In determining whether a parent or parents are unfit or have neglected a child the court shall consider, *but is not limited to*, the [enumerated] circumstances, conduct, or conditions[.]" (emphasis added)).

¶35 Moreover, while we express no opinion as to whether "[t]estimony of clean tests and then a 'slip' is legally insufficient for the Court to find by clear and convincing evidence 'habitual or excessive use'" under subsection 78A-6-508(2)(c), evidence of an ongoing substance abuse problem is surely relevant to a parent's ability, or inability, to "exercis[e] proper and effective parental care" pursuant to Utah Code subsection 78A-6-507(1)(d). Here, Father testified that he was initially "doing really good" on probation and "was clean," but that he "f[e]ll back" and stopped checking in with his probation officer "when [DCFS] stopped [his] visit[s] from [Child]." Consequently, Father's challenge to the court's finding that he "would likely need some services before he would be an appropriate parent" is not well taken.

¶36 Father next challenges the juvenile court's finding regarding his "inability to remain out of jail." Relying on Father's testimony, the juvenile court found that Father was released from jail on March 3, 2015; that he was subsequently reincarcerated on September 7, 2015, for a probation violation; and that he would not be released from jail until May 14, 2016. Father contends that "the Code provides direction for the Court as to how incarceration may be viewed as evidence of unfitness" and observes that under Utah Code subsection 78A-6-508(2)(e), "[t]he Court may consider 'whether the parent is incarcerated as a result of conviction of a felony, and the sentence is of such a length that the child will be deprived of a normal home for more than one year.'" (Quoting Utah Code Ann. § 78A-6-508(2)(e).) Father therefore contends that the juvenile court could not rely on his incarceration in terminating his parental rights because "the evidence found by the Court does not include that [Father] was convicted of a felony,"[6] and because Father "had been

---

6. In its findings, the juvenile court noted that on the day Child was born, Father "was incarcerated in jail on a conviction of Theft by Receiving Stolen Property" but that "[n]o evidence was

(continued…)

incarcerated nine and a half weeks as of the trial date."[7] We are not persuaded.

¶37 To begin with, in terminating Father's parental rights, the juvenile court did not rely on subsection 78A-6-508(2)(e) as evidence of grounds for termination. In addition, as previously discussed, the circumstances listed under subsection 78A-6-508(2) do not apply to subsection 78A-6-507(1)(d), on which the district court relied. *Supra* ¶¶ 33–34. Rather, subsection 78A-6-507(1)(d) requires a finding that "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care *in the near future*." Utah Code Ann. § 78A-6-507(1)(d)(iii) (LexisNexis 2012) (emphasis added). This is an indication that parental rights may be terminated pursuant to subsection 78A-6-507(1)(d) without consideration as to whether "the child will be deprived of a normal home *for more than one*

_____

(…continued)
presented as to whether this was a felony or a misdemeanor conviction."

7. As part of this argument, Father contends that the juvenile court was "not entitled on November 12th, 2015, to take into account the expected sentence up to May 14th, 2016, which had not happened yet." Essentially, Father's argument is that the juvenile court could not consider the length of Father's prospective incarceration in determining whether the one-year incarceration provision of Utah Code subsection 78A-6-508(2)(e) was met; rather, according to Father, the court could consider only the length of Father's "actual incarceration on the trial date," which was nine and a half weeks. Aside from the fact that the juvenile court did not rely on subsection 78A-6-508(2)(e) in making its decision, *see supra* ¶ 30, Father's argument on this point is inadequately briefed, *see* Utah R. App. P. 24(a)(9). Father has not cited any authority or provided any legal analysis in support of this argument, and we therefore decline to further address it.

*year*" due to a parent's incarceration. *Compare id.* § 78A-6-508(2)(e) (emphasis added), *with id.* § 78A-6-507(1)(d). Indeed, if we were to adopt Father's argument, the "more than one year" time frame enumerated in subsection 78A-6-508(2)(e) would essentially render subsection 78A-6-507(1)(d)'s "in the near future" time frame equivalent to at least one year. However, we presume that "the legislature used the different terms advisedly and we enforce them as plainly set forth in the statute." *State v. Johnson*, 2007 UT App 392, ¶ 10, 174 P.3d 654; *see also Valencia v. Labor Comm'n*, 2015 UT App 50, ¶ 10, 345 P.3d 1277 ("We presume the legislature used each term in the statute advisedly and according to its ordinary meaning."). Moreover, subsection 78A-6-507(1)(d) does not require that a parent's inability to exercise proper care of a child result from a parent's "incarcerat[ion] as a result of conviction of a felony," *see* Utah Code Ann. § 78A-6-508(2)(e), or as a result of incarceration at all. To the contrary, the plain language of subsection 78A-6-507(1)(d) indicates that a parent's inability to exercise proper care of a child in the near future could result from a variety of circumstances including, but not limited to, a parent's incarceration. Consequently, we conclude that Father's argument regarding subsection 78A-6-508(2)(e) is misplaced and that the juvenile court could consider evidence of Father's incarceration in determining whether to terminate his parental rights under subsection 78A-6-507(1)(d).

¶38     After reviewing the record, we conclude that there was ample evidence to support the juvenile court's determination that Father was unable or unwilling to remedy the circumstances that caused Child to be in an out-of-home placement. *See* Utah Code Ann. § 78A-6-507(1)(d). Father testified at the termination trial that he was incarcerated on the day of Child's birth in November 2014—as a result of his conviction of theft by receiving stolen property—and that he was released from jail on March 3, 2015. He further testified that he was most recently incarcerated on September 7, 2015, for a probation violation and that he would not be released from jail until May 14, 2016. From March 3, 2015, to September 7, 2015, while Father was out of jail,

he lived with his parents and worked two jobs, which he lost when he was reincarcerated.

¶39    Father further testified that while he was out of jail, he visited with Child twice before his visitations were stopped because he "didn't have the paternal rights." Subsequently, after the juvenile court adjudicated Father's paternity in August 2015, he had two more visits with Child about two weeks before he went back to jail. Father testified that he loved Child and that he "just want[ed] to be there for [his] daughter." And he testified that he was back in jail "for [a] probation violation" for "not checking in." Father explained:

> I was doing really good when I was on probation. When I knew that my daughter was born, I was doing really good. I had two jobs. I was doing my classes that my [probation officer] ordered me to do. I was checking in. I was doing my [urinalysis tests]. I came out good. I was clean.
>
> Then after that, when they stopped my visit[s] from my daughter, I kind of f[e]ll back, because I was always behind the mother so she can be clean, which she wasn't going to, and picking up more charges because of her saying that I hit her, which I didn't ever hit her. . . .

Father also testified that when he was working two jobs between March and September 2015, he did not "save or put away any money for [Child]," because he was "trying to pay [his] mom the money that she put out to bail [Mother]." He testified that he had had no income since he had been reincarcerated in September. During the termination trial, the juvenile court also acknowledged that Father had "convictions for narcotic equipment [and] possession of controlled substance," according to the petition to terminate parental rights.

¶40 We conclude that there was sufficient evidence to support the juvenile court's termination of Father's parental rights based on Utah Code subsection 78A-6-507(1)(d). Specifically, Father was incarcerated on the day of Child's birth. Father was released from jail on March 3, 2015, and he was initially "doing really good" and "was clean." Nevertheless, at some point after DCFS stopped his visits with Child because he had not yet established his paternity, Father "f[e]ll back" and stopped checking in with his probation officer. He also picked up a new charge for allegedly hitting Mother. Father was reincarcerated in September 2015. Thus, at the time of the termination trial in November 2015, when Child was approximately eleven months old, Father had been incarcerated for a significant portion of Child's life, and he would remain incarcerated until May 14, 2016, when Child would be nearly eighteen months old. Consequently, the record supports the juvenile court's determination that Father's "habitual incarceration demonstrated his inability or unwillingness to remedy the circumstances that caused [Child] to be in an out-of-home placement." *See* Utah Code Ann. § 78A-6-507(1)(d)(ii).

¶41 The record also supports the juvenile court's determination that there was a substantial likelihood that Father would "not be capable of exercising proper and effective parental care of [Child] in the near future." *See id.* § 78A-6-507(1)(d)(iii). At the November 2015 termination trial, Father testified that he would be incarcerated until May 14, 2016. Thus, Father was incapable of exercising proper and effective parental care of Child for at least the next six months, at which point Child would already be eighteen months old. Moreover, as previously discussed, Father's trial testimony indicated that he "appears to have a substance abuse issue that needs to be addressed," and his likely need for services would only further delay his ability to be an effective parent. Father also testified that he had had no income since he had been reincarcerated in September 2015.

¶42    In sum, there was sufficient evidence to support the juvenile court's determination that Father was unable to remedy the circumstances that caused Child to be in an out-of-home placement and that there was a substantial likelihood that Father would not be capable of exercising proper and effective parental care in the near future.

¶43    In a related but separate argument, Father contends that "[t]he Court's finding that [he] 'did nothing' to establish paternity between March, 2015, and July 2015, through a mechanism other than DNA testing is unsupported by the record, and therefore constitutes an abuse of discretion." Again, "[f]indings of fact in a parental rights termination proceeding are overturned only if they are clearly erroneous." *In re G.B.*, 2002 UT App 270, ¶ 9, 53 P.3d 963 (citation and internal quotation marks omitted).

¶44    The juvenile court found that "[a]lthough provisional counsel was appointed for [Father] on April 28, 2015 to help him establish paternity, he did not attempt to establish paternity through an alternative route [other than DNA testing] until July, 2015." The court further found:

> 20. [Father] missed the first three months of [Child's] life because he was incarcerated. Over the next five months, [Father] made efforts to establish his paternity but they seem to have been in short bursts of energy and effort. In mid-March and early April, [Father] made serious efforts to establish his paternity. From late April, when the court provisionally appointed [counsel] until early July, there was no evidence that [Father] made any efforts. Then another burst of energy and effort occurred in July.
>
> 21. While taking nearly nine months to establish paternity is concerning, what is more concerning is [Father's] inability to remain out of jail.

¶45 The court's written findings demonstrate that, contrary to Father's assertion, the juvenile court did not find that Father "'did nothing' to establish paternity between March, 2015, and July 2015, through a mechanism other than DNA testing." Rather, the court's findings establish that it recognized Father's "serious efforts to establish his paternity" between mid-March and early April. However, the record indicates that after the court appointed provisional counsel on April 28, 2015, Father failed to make any additional efforts beyond DNA testing to establish paternity until July 7.[8] At the July 7 hearing, the court stated, "I don't know why you haven't filed a voluntary declaration of paternity, . . . I mean, . . . how simple is that? Could have been done months ago." That same day, Father and Mother filed affidavits attesting that Father is Child's biological father, and the next day, Father filed a motion to adjudicate his paternity. Based on the foregoing, the court's finding that "[f]rom late April, when the court provisionally appointed [counsel] until early July, there was no evidence that [Father] made any efforts" to establish paternity through an alternative route other than DNA testing is supported by the record evidence.

¶46 In any event, although the court indicated that the amount of time—nine months—it took Father to establish paternity was "concerning," the court's findings demonstrate that it viewed the delay as a relatively minor issue and that its

8. Father asserts, without citation to the record, that "the record supports that in order to establish paternity in some way other than DNA testing, [he] (1) wrote a letter attesting he would execute an[y] paperwork necessary to establish paternity; (2) requested counsel; (3) proceeded to the Office of Vital Statistics and was not permitted to execute a voluntary declaration because of [Mother's] lack of I.D.; (4) offered and requested to be adjudicated legal father at [the] hearing [on] July 7th, 2015; and (5) substantially [and] immediately filed a certified statement and motion to be adjudicated father."

ultimate decision to terminate Father's parental rights was primarily based on his "inability to remain out of jail." As previously discussed, in terminating Father's parental rights under Utah Code subsection 78A-6-507(1)(d), the juvenile court found (1) that Child was being cared for in a foster home, (2) that "there was still no legal parent able to properly care for [Child], nor had there been in a year" and that Father had demonstrated an inability or unwillingness to remedy the circumstances causing out-of-home placement of Child due to his habitual incarceration, and (3) that because Father would be incarcerated until May 14, 2016, he was not capable of taking care of Child in the near future. We conclude that Father's argument on this point mischaracterizes the court's findings and that the court's findings regarding Father's efforts to establish paternity apart from DNA evidence were supported by the facts.

## CONCLUSION

¶47    Based on the foregoing, we affirm the juvenile court's order terminating Father's parental rights.

_____